IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| FLUOR FEDERAL SOLUTIONS, LLC,   ) | |
| ) | |
| Plaintiff,   ) | |
| ) | |
| v.   ) | Civil Action No. 7:19-cv-00698 |
| ) | |
| BAE SYSTEMS ORDNANCE SYSTEMS,   ) | By: Elizabeth K. Dillon |
| INC.,   ) | United States District Judge |
| ) | |
| Defendant.   ) | |

**MEMORANDUM OPINION**

Trial in this matter is currently scheduled to begin on January 17, 2023. Pending before the court are both parties' cross motions for partial summary judgment. Both motions are fully briefed, and the court heard argument on December 16, 2022. For the reasons stated herein, the court will grant in part and deny in part BAE Systems Ordnance Systems, Inc.'s ("BAE") motion for partial summary judgment (Dkt. No. 104) and deny in full Fluor Federal Solutions, LLC's ("Fluor") motion for partial summary judgment (Dkt. No. 112).

I.  BACKGROUND[1]

This case concerns a dispute between BAE and Fluor regarding a subcontract for the construction of a new natural-gas-fired boiler facility at the Radford Army Ammunition Plant in Radford, Virginia. In May 2011, the United States Army ("Army") awarded BAE a Basic Ordering Agreement and, in December 2013, executed Task Order 00029 with BAE. This Task Order funded the design of a new natural gas-fired combined heating and power plant ("CHPP"); one of the purposes of this project was to replace the coal-fired boilers in the plant.

---

[1] The following material facts are taken from the summary judgment record and, unless otherwise stated, are undisputed. Facts not material to the issues are omitted.

1

On October 7, 2015, BAE issued a request for proposal ("RFP") for a firm-fixed price subcontract for the design and construction of a temporary boiler facility to several bidders, including Fluor. On December 10, 2015, Fluor submitted a firm-fixed price proposal for the design, construction and commissioning of a temporary facility in the amount of $10,965,787. On December 14, 2015, four days after receiving Fluor's proposal, the Army notified BAE that the CHPP project was cancelled and that it intended to move the boiler facility to a permanent location elsewhere. At that time, all bidders, including Fluor, had submitted proposals for the original temporary facility scope of work at the temporary location.

BAE decided to complete the competition and award a design subcontract to Fluor. On December 30, 2015, BAE and Fluor executed a Subcontract only for the 'design' phase (but not the 'construction' phase) of the temporary package boiler facility in the amount of $1,519,560.85. (Dkt. Nos. 105-6; 113-53.) The next day, on December 31, 2015, Jared Hendrick of BAE emailed Roy Harris of Fluor, informing Fluor that the Army had decided to change the location of the boiler to a permanent facility and thus that the project scope would be changing. (Dkt Nos. 105-7; 113-15.) On January 12, 2016, BAE issued Fluor a proposed Statement of Work Addendum, Revision 0 for the change to the permanent facility. On January 15, 2016, Erin Phalen of BAE emailed Lura Lewis of Fluor to "request that [Fluor] review the changes in [scope of work] and send any cost impact by 12:00 p.m. on January 21[, 2016]," including "a detailed breakdown of cost element." (Dkt. No. 105-8.) On January 21, 2016, Fluor submitted a change proposal addressing potential cost impact associated with Statement of Work Addendum, Revision 0, reflecting an increase price of $336,248 for the design changes.

The construction phase work for the project was not added to Fluor's agreement with BAE until March 23, 2016, when the parties executed Modification 1 ("Mod 1"). (Dkt. No. 105-

9 ["Mod 1"].) Mod 1 included the same price for the construction portion of the original scope of work (i.e., the temporary facility) that Fluor had initially proposed in its December 2015 proposal update to BAE, as a starting point for pricing changes. (Dkt. Nos. 105-9, 105-29.) At the time, the contract had not been modified to reflect a permanent facility, but when the parties executed Mod 1, it was understood by both parties that a temporary facility would not be built. (Answer ¶ 34.) On April 1, 2016, the parties executed Modification 2 to the Subcontract ("Mod 2"), which also included the same prices from the December 2015 proposal update. (Dkt. No. 105-10 ["Mod 2"].) On September 1, 2016, the parties executed Modification 3 to the Subcontract ("Mod 3"), which established the agreed total firm-fixed price of $1,852,723.82 for the design of the permanent facility and authorized payment. (Dkt. No. 105-11 ["Mod 3"].)

The parties proceeded to negotiate a firm-fixed price for the changes to the project, including Fluor's construction work. On April 4, 2016, Fluor submitted its first proposal to complete construction of a permanent facility at a fixed-firm price of $27,490,300.39. (Dkt. No. 113-27.) On June 17, 2016, Fluor submitted a second proposal for construction of a permanent facility at a fixed-firm price of $24,942,758. (Dkt. No. 113-28.) Then, on or about November 29, 2016, after continued negotiations, the parties executed Modification 4 to the Subcontract ("Mod 4"). (Dkt. No. 105-22 ["Mod 4"].) Mod 4 was an Unpriced Change Order[2] ("UCO") which incorporated Statement of Work Addendum, Revision 4—i.e., construction of a permanent facility—into the subcontract, with the firm-fixed price to be definitized later (by a deadline upon which the parties still do not agree).

---

[2] A 'change order' is "a written order, signed by the contracting officer, that directs the contractor to make a change that the Changes clause authorizes the contracting officer to order without the contractor's consent." FAR § 2.101. An 'unpriced change order,' or UCO, generally refers to a change order not forwardly priced, meaning it defines the work to be performed while leaving the final negotiated priced to be determined later.

On March 29, 2017, with the firm-fixed price for construction still not definitized, the parties executed Modification 7 to the Subcontract ("Mod 7"), which revised the Mod 4 UCO in several important respects. (Dkt. No. 105-27 ["Mod 7"].) For one, under the revised UCO (Dkt. No. 105-40 ["Revised UCO"]), Fluor was required to "promptly submit a change proposal in accordance with [Federal Acquisition Regulation] 15.408 Table 15-2, Section III." (*Id.* at 3.) On August 15, 2017, Fluor submitted a change proposal that purported to reflect $33,230,509 in costs incurred to construct the permanent facility, and $15,732,472 in charges, delays, acceleration, and other costs. (Dkt. No. 113-40.) On October 26, 2017, BAE rejected Fluor's change proposal, noting that the "primary inadequacy found is that the Proposal does not comply with Section 2" of Mod 7. (Dkt. No. 113-41.) In August 2019, Fluor submitted an updated change proposal to capture what Fluor submitted were its actual costs. (Dkt No. 113-42.) This proposal claimed $50,254,837 in costs on the project. (*Id.*) Fluor claims it has only been paid $29,478,827.33 by BAE; BAE disputes that Fluor is entitled to this amount, or the costs claimed in its August 2019 proposal. (Dkt. Nos. 113 at 46, 134 at 46.)

Fluor brought this action in October 2019, asserting claims for breach of contract, quantum meruit, unjust enrichment, breach of the duty of good faith and fair dealing, fraud in the inducement, and for declaratory judgment. (Dkt. No. 1 at 14–21.) BAE asserted counterclaims for breach of contract and for declaratory judgment. (Dkt. No. 40 at 54–59.) After cross-motions to dismiss, only the breach-of-contract claims remain.

## II.  LEGAL STANDARDS

### A.  Summary Judgment

In considering cross-motions for summary judgment, the court "examines each motion separately, employing the familiar standard" provided by Rule 56. *Desmond v. PNGI Charles*

*Town Gaming*, 630 F.3d 351, 354 (4th Cir. 2011). Thus, each motion is reviewed "on its own merits to determine whether either of the parties deserve judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003).

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material fact is one that "might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute of material fact is "genuine" if sufficient evidence favoring the non-moving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248–49.

The moving party bears the initial burden of showing the absence of a genuine dispute of material fact. *Celotex*, 477 U.S. at 323. Once the moving party makes this showing, however, the opposing party may not rest upon mere allegations or denials, but rather must, by affidavits or other means permitted by the Rule, set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c), 56(e). All inferences must be viewed in a light most favorable to the non-moving party, but the nonmovant "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

When the record is insufficient for the court to determine either all claims or all elements of a single claim in connection with a motion for summary judgment, the court nevertheless may grant a motion for summary judgment in part as to any portion of a claim or with respect to an affirmative defense. 10B Charles Alan Wright & Arthur R. Miller, Federal Practice and

Procedure §§ 2734, 2735, 2737 (citing cases); *see also* Fed. R. Civ. P. 56 Committee Notes on Rules—2010 Amendment ("The first sentence of [Rule 56(a)] is added to make clear at the beginning that summary judgment may be requested not only as to an entire case but also as to a claim, defense, or part of a claim or defense."). In providing such relief, the court may find that certain facts, issues, or portions of claims have been established for purposes of trial and may grant partial summary judgment on an affirmative defense. Wright & Miller at §§ 2734, 2735, 2737.

**B. Breach of Contract**

Under Virginia law, "when the terms in a contract are clear and unambiguous, the contract is construed according to its plain meaning." *Dixon Lumber Co. v. Austinville Limestone Co., Inc.*, 256 F. Supp. 3d 658, 670 (W.D. Va. 2017) (quoting *TravCo Ins. Co. v. Ward*, 736 S.E.2d 321, 325 (Va. 2012)) (internal quotations omitted). "When construing contract language, the words used should be their plain, ordinary, and popular meaning." *Id.* (internal citations omitted). "Contracts must be interpreted holistically, giving meaning to all provisions wherever possible." *Id.* (internal citations omitted). "[T]here is a presumption that the parties have not used words needlessly." *Preferred Sys. Sols., Inc. v. GP Consulting, LLC*, 732 S.E.2d 676, 681 (Va. 2012).

The question of whether the language used in a contract is unambiguous is a question of law for the court to consider. *Washington Metro. Area Transit Auth. v. Potomac Invest. Props., Inc.*, 476 F.3d 231, 235 (4th Cir. 2007). Summary judgment is appropriate "when the contract in question is unambiguous or when an ambiguity can be definitively resolved by reference to extrinsic evidence." *SAS Inst., Inc. v. World Programming Ltd.*, 874 F.3d 370, 380 (4th Cir. 2017) (internal quotations and citations omitted). Moreover, "[e]ven where a court

6

. . . . determines as a matter of law that the contract is ambiguous, it may yet examine evidence extrinsic to the contract that is included in the summary judgment materials, and, if the evidence is, as a matter of law, dispositive of the interpretative issue, grant summary judgment on that basis." *Washington Metro.*, 476 F.3d at 235. "If, however, resort to extrinsic evidence in the summary judgment materials leaves genuine issues of fact respecting the contract's proper interpretation, summary judgment must of course be refused and interpretation left to the trier of fact." *Id.*

### III. ANALYSIS

**A. BAE's Motion for Partial Summary Judgment**

In its motion, BAE asks the court to:

1. Hold that Fluor cannot recover in excess of the not-to-exceed (NTE) amount set forth in Mod 7, totaling no more than $31,626,076.15 for Base Scope work;

2. Hold that Fluor breached the requirement in Mod 7 that it supply cost proposals complaint with FAR § 15.408 and order Fluor to return the $6 million that BAE advanced as part of Mod 7;

3. Hold that Fluor is bound by the fixed price it agreed to for the original scope of work at the temporary location; and

4. Hold that Fluor failed to obtain written authorization for its claimed PCNs prior to executing the alleged changes as required by the Subcontract.

1. **Modification 7 to the Subcontract established a not-to-exceed ceiling price of $19,720,652.00 for work performed by Fluor to construct the permanent boiler facility.**

BAE asks the court to hold that Fluor cannot recover more than the "not-to-exceed" (NTE) amount for Base Scope work,[3] which they allege totals no more than $31,626,075,15.

Section II of the Mod 4 UCO—titled "Limitation of Liability"—includes, in relevant part, the following terms:

> A. The maximum BAE Systems' liability for work performed by Seller [Fluor] pursuant to this UCO (also referred to as. [sic] the "Not-to-Exceed Amount") is $11,720,652.
>
> B. This value is not inclusive of the following:
>
> - Updated costs presented in the 10/20/2016 proposal submission or
> - Changes identified outside of SOW Addendum – Temporary Package Boiler Facility Revision 4
> - Other costs, as previously negotiated between the Seller and BAE Systems.

(*See* Dkt. No. 105-22 ["Mod 4 UCO"] at 6.) Of most relevance here, paragraph 9 of Mod 7 amended the Mod 4 UCO as follows:

> Wherever referred to, the Not-to-Exceed (NTE) amount is increased from $11,720,652 by $8,000,000 resulting in a revised total NTE amount of $19,720,652.00. This establishes an $8,000,000 increase to the NTE for construction costs resulting from Attachment A, Revision 4 of the SOW.

(Mod 7 at 3.) Following Mod 7, the "Limitation of Liability" section of the UCO now states:

> A. The maximum BAE Systems' liability for work performed by Seller [Fluor] pursuant to this UCO (also referred to as. [sic] the "Not-to-Exceed Amount") is *$19,720,652.00*.
>
> B. This value is not inclusive of costs related to changes identified outside of Attachment A, Revision 4 of the SOW.

(Dkt. No. 105-40 ["Revised UCO] at 6 (emphasis added).)

---

[3] As used herein, "Base Scope work" refers to the scope of work that was to be performed by Fluor to construct the permanent boiler facility. This includes both the original scope of work identified in the original Statement of Work ("SOW") as well as work identified in Attachment A, Revision 4 of the Statement of Work.

BAE argues that, under the "clear and unambiguous" language of the UCO (as revised by Mod 7), Fluor cannot recover more than the NTE amount—which, according to BAE, is $19,720,652.00—for costs associated with work performed under SOW Addendum Revision 4.[4] Fluor's claim in this case seeks recovery of a total amount for Base Scope work; this includes work performed under both the original SOW (constructing a temporary facility) and SOW Addendum Revision 4. Because the parties have agreed on the price to perform the original scope of work ($11,905,424), which BAE has already paid Fluor and which is not disputed here, BAE argues that Fluor is entitled to no greater than a total of $31,626,076 for Base Scope work.

Fluor, on the other hand, argues that the Mod 7 UCO "does not include an NTE limit on Fluor's costs for Base Scope work to construct the permanent boiler facility." (Dkt. No. 130 at 11.) Contrary to BAE's reading of the UCO, Fluor claims that Mod 7 actually reflects the parties' mutual agreement to *remove* the NTE limitation on the definitized price for Fluor's Base Scope work. (*Id.*)

The plain language of the UCO, as revised by Mod 7, unambiguously supports BAE's interpretation of the relevant provisions of the Subcontract. As a starting point, Sections II.A and II.B of the Mod 4 UCO are quite straightforward: BAE's "maximum [] liability" (in other words, the NTE amount) for the cost of work performed by Fluor pursuant to the UCO would be set at $11,720,652, exclusive of Fluor's cost associated with changes identified outside of SOW Addendum Revision 4. (*See* Revised UCO at 6.) Then, Mod 7 revised the UCO by declaring that "*wherever referred to*" in the Mod 4 UCO, the NTE amount would be "increased . . . by $8

---

[4] The only exception to this Mod 7 NTE amount, BAE argues, would be for cost associated with "changes identified outside of [SOW Addendum Revision 4]." (*See* Revised UCO at 6.) BAE disputes whether Fluor has properly justified the costs it seeks for work performed in relation to SOW Addendum Revision 4, but does not seem to dispute that, assuming Fluor properly justified its costs, it could recover them—even in excess of the NTE amount.

million," raising the previous NTE amount of $11,720,652 up to a new limit of $19,720,652. (*See* Mod 7 at 2 (emphasis added).)  The natural import of this provision is twofold: (1) to the extent the prior UCO used the figure '$11,720,652.00' in reference to the NTE amount, Mod 7 replaced that figure with '$19,720,652.00'; and (2) to the extent Mod 4 referred to BAE's 'maximum liability' for work performed under the UCO, after Mod 7 that would now correspond to an amount of $19,720,652 instead of $11,720,652.  Paragraph 9 of Mod 7 did not add any new references to an NTE amount into the Subcontract, nor did it remove any; it simply changed the number from $11,720,652 to $19,720,652 wherever that number was used in connection with BAE's maximum liability.

Looking to the UCO (as revised by Mod 7), it plainly states that "[t]he maximum BAE Systems[] liability for work performed by Seller pursuant to this UCO (also referred to as[] the "Not-to-Exceed Amount") is $19,720,652.00" and that the only exception to that NTE amount is for changes outside SOW Addendum Revision 4.  (Revised UCO at 6.)  And even if the revisions themselves did not make this clear, Mod 7 further provides that these changes "establish[] an $8,000,000 increase to the NTE for construction costs resulting from Attachment A, Revision 4 of the SOW."  (Mod 7 at 3.)

Fluor relies on other sections of the UCO to argue for an inference that the Subcontract does not include an NTE, neither of which supersede what is unambiguous language to the contrary.  First, Fluor points to Section IV of the UCO, labeled "Termination."  In the Mod 4 UCO, Section IV stated, in relevant part:

> B. In the event of automatic termination, or termination for convenience, the Seller [Fluor] shall be reimbursed for all allowable costs in accordance with applicable provisions of the termination for convenience clause, *but not in excess of the maximum BAE Systems' liability stated in section II Item A above.*

10

> C. BAE Systems shall have the right to terminate the UCO, in whole or in part, at any time in the event of the following: (i) The parties fail to agree or fail to make progress to reach agreement on the terms and conditions of a definitive Agreement; (ii) the difference between the parties with respect to a definitive Agreement are not resolved within the time specified for definitization; and (iii) default on the part of the Seller. In such cases, the Seller shall be reimbursed in accordance with the appropriate termination clause in the Subcontract, *but not in excess of the maximum contractor liability stated herein at section II Item A above.*

(Mod 4 UCO at 7 (emphasis added).) Mod 7 includes substantially identical language, except that the phrase "automatic termination" was removed from subsection B.

Fluor claims that, under Section IV of the UCO, the NTE amount applies in the event that BAE terminates its performance. That is correct. But where Fluor's interpretation veers off course is its insistence that the NTE *only* applies if BAE terminates Fluor's work. That contradicts the language in Section II, which sets the NTE amount "for work performed by Seller pursuant to this UCO" at $19,720,652, with only one caveat for changes identified outside of SOW Addendum Revision 4. Nothing in Section IV supports the conclusion that it is the only part of the UCO to which the NTE amount applies.

Fluor makes a crucial interpretive error while rehashing the language of the Mod 7 UCO. According to Fluor, "Mod 7 provides that the NTE will limit BAE's liability wherever referred to" and the UCO only "refer[s]" to an NTE in the termination section, meaning the NTE only applies upon termination. (Dkt. No. 130 at 14.) But here Fluor erroneously mixes and matches the words of Mod 7 with that of the revised UCO—two different, albeit related documents. In reality, the language "wherever referred to" comes from paragraph 9 of Mod 7, which provides that the NTE amount will be increased from $11,720,652 to $19,720,652 "wherever referred to" throughout the UCO itself. In sum, it is not that the NTE only applies "wherever referred to" in

11

the UCO, but rather that the NTE dollar figure already listed in Mod 4 would be changed to $19,720,652 "wherever referred to" in the UCO. Fluor reads Section II of the UCO as if it were merely a 'definitions' section, setting forth the meaning of "BAE's maximum liability" to the extent it appears elsewhere in the document. But that is not how the UCO is written. Rather, Section II is titled "Limitation on Liability," and it sets the NTE amount for the cost of the work described in the entirety of the UCO.

Fluor also points to a provision in Section V of the UCO, titled "Definitive Agreement Price." In the Mod 4 UCO, Section V.A stated:

> The definitive Agreement resulting from this UCO will include a negotiated firm-fixed price *not to exceed $11,720,652.00* for the referenced [sic] in Attachment 1 above.

(Mod 4 UCO at 8 (emphasis added).) Then, in Mod 7, the parties removed the language setting the NTE amount from this provision. The revised UCO states:

> The definitive Agreement resulting from this UCO will include a negotiated firm-fixed price.

(Revised UCO at 7.) Fluor argues that the removal of this language regarding the NTE amount from this sentence should be interpreted as an agreement by the parties to remove any maximum cost for Fluor's Base Scope work, such that the firm-fixed price could be definitized at any amount.

According to Fluor, "[i]t is difficult to conceive of a clearer expression of the Parties' intent" than this singular change to the "Definitive Agreement Price" section of the UCO. (*See* Dkt. No. 130 at 13.) But one would expect that the clearest expression of the parties' intent on whether the UCO imposes any limitations on BAE's liability for Fluor's work would be found in the "Limitation of Liability" section of the agreement. And here, the language of that section resolves the issue. Section II of the Mod 7 UCO states, in no uncertain terms, that BAE's

maximum liability for work performed by Fluor pursuant to the UCO is $19,720,652. Even if, viewed in isolation, the changes to Section IV of the UCO supported an inference that the parties removed any NTE cap from the agreement, that inference would not be sufficient for the court to ignore and displace the unequivocal language in Section II stating that the UCO includes an NTE of $19,720,652. Fluor notes that "the various provisions of Mod 7 must be harmonized," (*see* Dkt. No. 130 at 12 (citing *Virginia Ry. Co. v. Hood,* 146 S.E. 284, 285 (Va. 1929))), yet advocates for an interpretation that seemingly disregards the very section of the UCO that purports to address this issue.

All in all, BAE's motion for partial summary judgment is granted in part in that the court finds that the UCO, as revised by Mod 7 to the Subcontract, imposes a not-to-exceed amount of $19,720,652 for BAE's liability for work completed by Fluor pursuant to the UCO. Thus, if the NTE provisions of the UCO apply to the parties' agreement, Fluor cannot recover in excess of the above amount for work pursuant to the UCO. However, if Fluor were to prove at trial that BAE breached the Subcontract, that would necessarily raise the question of whether BAE is still entitled to enforce the NTE provision against Fluor. Because that underlying breach question involves numerous unresolved disputes of material fact, the court will deny BAE's motion to the extent it seeks a ruling that Fluor's damages are definitively capped.

> **2. Fluor is bound by the fixed price it agreed to for the original scope of work at the temporary location.**

BAE asks the court to grant it summary judgment by holding that Fluor is bound by the price it proposed in its December 2015 fixed price proposal for the original scope of work to construct the temporary facility. Fluor's argument in opposition is that BAE should be estopped from enforcing the firm fixed price contained in the Subcontract for the original temporary facility scope of work because BAE withheld from Fluor the fact that two weeks before the

Subcontract was executed, the Army requested that the scope of the project be changed to a permanent facility at a different location.

To invoke equitable estoppel, the following six elements must be established:

> (1) There must be a representation or concealment of material facts;
> (2) The representation or concealment must have been with knowledge of the true state of facts;
> (3) The party to whom it was made must have been ignorant of the truth of the matter;
> (4) It must have been made with the intention that the other party should act on it;
> (5) The representation or concealment must be proved to have been the inducement to the action of the other party; and
> (6) The party claiming the estoppel must have been misled to her injury.

*Anderson v. Cox*, 977 F. Supp. 413, 416 (W.D. Va. 1997) (citing *Westminster Investing Corp. v. Lamps Unlimited Inc.*, 379 S.E.2d 316, 319 n.2 (Va. 1989)).

Fluor's claim to equitable estoppel is not without merit. Two weeks before execution of the Subcontract, the Army expressed to BAE its request that the scope of the project be changed from a temporary facility at one location to a permanent facility at another (and BAE's emails, as well as the deposition of its corporate representative, indicate that it was aware of the possibility of this change much earlier).[5] At the time of execution of the Subcontract, BAE undoubtedly knew that the proposed facility which Fluor was contracting to design likely would undergo significant changes in scope shortly after execution.[6] It is undisputed that BAE withheld that information with Fluor before execution of the Subcontract and that Fluor was ignorant of that

---

[5] *See* Dkt. No. 130-58 (email from BAE project manager noting that "[t]he Government has asked [BAE] to provide a construction cost estimate to transform the temporary steam-only generation facility . . . into a permanent facility.").

[6] *See* Dkt. No. 130-59 (corporate representative of BAE agreed with counsel for Fluor that "as of December 23[, 2015], BAE knew that that the boilers no longer needed to be moveable and housed in a temporary facility").

14

information. The circumstances also show that BAE concealed the Army's expressed intentions with the aim that the parties would negotiate the changes in price after Fluor had already won the contract, and that Fluor did indeed bid the project under the expectation that if it won the project, the scope of its work would include the design (and, as it proposed at the time, construction) of a temporary facility.[7]

But Fluor's argument ultimately proves specious for two reasons. First, when it learned of the changes to the project scope from BAE's December 31, 2015 email, Fluor did not retract its initial fixed price proposals, object to negotiating with BAE on new costs associated with the change, or demand any relief; instead, it carried on under the contract and stood by the prices it had originally proposed for the temporary facility before it became aware of the changes. As another district court has noted:

> One entitled to relief can affirm or avoid the contract, but he cannot do both; if he adopts a part, he adopts it all. He must reject it entirely if he desires to obtain relief. Defendant cannot accept the benefits of the contract and then assert he is entitled to be relieved of its obligations. His action was a confirmation of the contract and a waiver of any alleged misrepresentation, mistake, fraud or other wrong. *The time for him to demand relief is upon the discovery of the alleged misrepresentations*.

See *United States v. Idlewild Pharm., Inc.*, 308 F. Supp. 19, 23 (E.D. Va. 1969) (emphasis added). Fluor accepted the benefits of winning the project, and it implicitly confirmed the contract and waived any alleged misrepresentations when it reaffirmed the original prices by agreeing to Mods 1 and 2 to the Subcontract on March 31 and April 1, 2016—importantly, as a

---

[7] Most notably on this issue, in mid-December 2015 representatives of BAE took employees of Fluor on a walk-down of the temporary project location (despite BAE's awareness that the boiler facility more than likely would not be built there), and contemporaneous emails indicate that Fluor based its pricing, at least in part, upon information gleaned from this walk-down. (*See* Dkt. Nos. 113-9, 113-10.)

starting point for negotiating the additional cost changes that would result from the now-permanent facility.

Moreover, although Fluor was misled here, it was not ultimately misled to its detriment. First, Fluor was afforded the option to negotiate a new price that would account for all the changes. Relatedly, if Fluor is convinced today that it cannot legally be bound to this portion of the Subcontract, the same could have been said at the time of execution; if Fluor did not want to continue with the project in light of the new information and substantial shift in scope, it could have taken remedial action then. But it did not. Second, when Fluor initially won the project, the Subcontract covered only the design of the facility—not the construction (although Fluor had bid for both). Not until March 2016—when Fluor was fully aware of the changes—did the parties incorporate the construction phase into the agreement; thus, Fluor was not ultimately induced to bind itself to any fixed price on construction of a temporary facility in December 2015. Lastly, in some respect Fluor enjoyed a benefit from BAE's conduct. Had BAE disclosed the putative changes and reopened competition by asking the bidders to revise their proposals in light of those changes, Fluor could have lost the project. Instead, Fluor, having already won the project, had the opportunity to negotiate the price delta between designing the temporary facility and the permanent facility with a valid agreement already in place.

To resolve this issue, the court "need not undertake an exhaustive analysis of each element that constitutes equitable estoppel. Instead, [it] must only look to the fundamental purpose of estoppel to reach [the] conclusion that the doctrine is unavailable in this case." *Cox*, 97 F. Supp. at 415. "The legal principle underlying the theory of equitable estoppel rests on a simple proposition: it is unfair for a party to rely on a contract when it works to its advantage, and repudiate it when it works to its disadvantage." *Wachovia Bank, Nat'l Ass'n v. Schmidt*, 445

F.3d 762, 769 (4th Cir. 2006) (internal quotations and brackets omitted). Here, Fluor cannot enforce some provisions of the Subcontract while simultaneously avoiding others. As such, BAE's motion for partial summary judgment will be granted, in that the court holds that Fluor is bound by the fixed price it agreed to for the original scope of work at the temporary boiler facility location.

### 3. BAE's motion for partial summary judgment is otherwise denied, due to remaining disputes of material fact.

Lastly, BAE's motion asks the court to hold (1) that Fluor breached the requirement in Mod 7 that it supply cost proposals compliant with Federal Acquisition Regulation ("FAR") § 15.408, and as a remedy order that Fluor return the $6 million that BAE advanced as part of Mod 7; and (2) that Fluor is precluded from recovering for its claimed project change notices ("PCNs"), other than PCNs 008, 009, 033, and 036, because it failed to obtain written authorization for them prior to executing the alleged changes as is required under the Subcontract.

Regarding the cost proposals, the parties expect to elicit conflicting testimony and evidence concerning Fluor's change proposals on the project (and BAE's evaluation thereof), including expert testimony regarding whether Fluor's proposals met FAR § 15.408's requirements. Disputes of material fact pervade that issue, so the court will deny BAE's motion for partial summary judgment in this regard.

As for the PCNs, the parties have raised competing narratives regarding whether Fluor was instructed to make certain changes, ordered to do certain work that it considered a change, and/or prevented from obtaining authorization for changes. Because there are still several disputes of material fact as to this issue, the court will also deny BAE's motion for partial summary judgment on this ground.

B. **Fluor's Motion for Partial Summary Judgment**

The court denies Fluor's motion for partial[8] summary judgment in full for two reasons. First, for the reasons already explained, and even with facts construed in Fluor's favor, BAE's partial summary judgment motion is granted in part. Obviously, then, in reviewing Fluor's motion—which requires the court to construe the record in *BAE's* favor—Fluor's motion cannot succeed to the extent it addresses the same issues on which the court grants BAE partial summary judgment. *See Rossignol*, 316 F.3d at 522–23 (explaining that a district court faced with cross-motions for summary judgments generally should review each motion on its own merits, but that where summary judgment has been granted for one side, it "necessarily" meant the opposing party's motion must be denied). Specifically, Fluor's motion asks the court to hold that Mod 7 does not restrict recovery for costs for the Base Scope work to the NTE amount. The court has already held that the NTE in Section II of the UCO does apply to all Base Scope work. In turn, Fluor's motion for partial summary judgment will be denied on this basis.

As to the remaining grounds, genuine disputes of material fact remain on each of the issues. The parties dispute each other's characterizations of myriad details necessary to determine whether BAE waived the contractual completion date or breached its implied duty of good faith and fair dealing. Moreover, under Mod 7, the proposal costs for which Fluor seeks summary judgment are subject to the same FAR § 15.408 compliance requirement discussed in the context of BAE's motion, and the court has already noted that the parties present conflicting testimony and evidence as to what FAR § 15.408 requires. As such, Fluor's motion will be denied in full.

---

[8] Though stylized as a motion for partial summary judgment, the relief Fluor seeks does not seem partial in nature; in its brief Fluor asks the court to "enter summary judgment in Fluor's favor on all Counts set forth in Fluor's Complaint and against BAE on its Counterclaim in its entirety." (Dkt. No. 113 at 1.)

## III.  CONCLUSION

For the foregoing reasons, BAE's motion for partial summary judgment will be granted in part and denied in part, and Fluor's motion for partial summary judgment will be denied in full.  The court will enter an appropriate order.

Entered: January 13, 2023.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge