IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

CLERK'S OFFICE
U.S. DISTRICT COURT
AT ROANOKE, VA
FILED
October 30, 2024
LAURA A. AUSTIN, CLERK
BY: s/ M.Poff, Deputy Clerk

FLUOR FEDERAL SOLUTIONS, LLC,      )
                                   )
        Plaintiff / Counterclaim Defendant,   )
                                   )
v.                                 )        Civil Action No. 7:19-cv-00698
                                   )
BAE SYSTEMS ORDNANCE SYSTEMS,      )        By: Elizabeth K. Dillon
INC.,                              )            Chief United States District Judge
                                   )
        Defendant / Counterclaim Plaintiff.   )

**MEMORANDUM OPINION
OF FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]**

In this case, plaintiff/counterclaim defendant Fluor Federal Solutions, LLC ("Fluor") and defendant/counterclaim plaintiff BAE Systems Ordnance Systems, Inc. ("BAE") each allege that the other breached the parties' subcontract for the design and construction of a new natural gas-fired boiler facility at the Radford Army Ammunition Plant in Radford, Virginia (the "Radford Plant").

The case was tried with the court sitting as finder of fact over the course of nine days. Prior to trial, the parties submitted their first proposed findings of fact and conclusions of law. (Dkt. Nos. 193, 194.)  The trial evidence included voluminous exhibits, as well as testimony from a number of witnesses.  Experts testified on behalf of both parties, presenting competing testimony on many factual issues.  Additionally, the parties submitted their closing arguments in writing after the trial, as well as proposed findings of fact and conclusions of law based on the trial evidence.  (Dkt. Nos. 228, 229 (redacted).)

---

[1] Some exhibits and a limited portion of the testimony at trial referred to "Highly Sensitive Documents" ("HSDs").  Resolution of the parties' claims has required the court to refer to HSDs, but the court has ensured that none of the information subject to such protection is included in this opinion.  Thus, the entirety of this opinion will be placed on the public docket.

Based on the trial evidence, the court issues this memorandum opinion, which constitutes its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## I.  OVERVIEW

This case involves some technical government contracting and accounting principles.  In turn, the facts of this case—as well as the parties' legal arguments—substantially refer to and rely upon these principles.  To assist the casual reader to better understand its decision, the court endeavors to define the relevant technical terms and concepts, as they appear throughout this opinion, in a straightforward way.

Moreover, this case is fact-intensive; the parties' arguments are, accordingly, highly fact-dependent.  As a result, this opinion devotes quite a few pages to the court's basic factual findings.  But without the broader context of the parties' positions, the importance of certain facts—and a reader unfamiliar with the case—likely will be lost.  Accordingly, the court begins with an over-simplified sketch of the relevant events and an overview of the parties' positions, and then continues to its findings of fact and conclusions of law.

This case concerns a dispute arising from a subcontract ("the Subcontract," occasionally also referred to as "the Contract") between Fluor and BAE for the construction of a new natural gas-fired boiler facility at the Radford Plant.  The United States Army contracted with BAE to construct and design a temporary boiler facility at the Radford Plant.  BAE then solicited proposals from bidders, including Fluor, for a subcontract.  Fluor ultimately won the contract to design the boiler facility, which the parties executed on December 30, 2015.  The next day, BAE informed Fluor that the Army had changed the scope of the project to a permanent boiler facility as opposed to a temporary facility, and at a different site.  Over the next several years, the parties negotiated on a new price to design (and, as was eventually added to the Subcontract, to

2

construct) the facility in light of the change from temporary to permanent.  In the process, the parties executed several modifications to the Subcontract.  Both parties agree that the project experienced significant delays and that its costs far exceeded the anticipated costs for the temporary facility.  They disagree as to the reasons behind those increased costs and who should bear them.  In essence, Fluor alleges that BAE has not fully paid Fluor for the work it performed under the Subcontract.  BAE maintains that Fluor has been overpaid, and BAE seeks reimbursement for that alleged overpayment, as well as damages for delay and for allegedly defective work by Fluor or its subcontractors.

Fluor brought this action in October 2019, asserting claims for breach of contract, quantum meruit, unjust enrichment, breach of the duty of good faith and fair dealing, fraud in the inducement, and for declaratory judgment.  (Compl. 14–21, Dkt. No. 1.)  BAE asserts counterclaims for breach of contract and for declaratory judgment.  (Counterclaim 54–59, Dkt. No. 40.)  After the court's rulings on cross-motions to dismiss and cross-motions for summary judgment, only the breach-of-contract claims remain.[2]

## II.  STANDARD OF REVIEW

Rule 52(a)(1) of the Federal Rules of Civil Procedure requires that the court make specific findings of fact and state conclusions of law separately in any action tried without a jury.  Specifically, this court must evaluate the testimony and demeanor of witnesses, as well as weigh the evidence and choose among conflicting inferences those which seem most reasonable.  *See Burgess v. Farrell Lines, Inc.*, 335 F.2d 885, 889–90 (4th Cir. 1964).

The court must do more than announce statements of ultimate fact, *United States ex rel. Belcon, Inc. v. Sherman Constr. Co.*, 800 F.2d 1321, 1324 (4th Cir. 1986), but it is not required

---

[2]  The court dismissed Fluor's fraud-in-the-inducement claim as time-barred.  (*See* Dkt. Nos. 32–33.)

"to make findings on all facts presented or to make detailed evidentiary findings . . . .  The ultimate test as to the adequacy of the findings will always be whether they are sufficiently comprehensive and pertinent to the issues to provide a basis for decision and whether they are supported by the evidence," *Darter v. Greenville Cmty. Hotel Corp.*, 301 F.2d 70, 75 (4th Cir. 1962).

## III.  FINDINGS OF FACT[3]

### A.  Factual Findings Concerning the Course of the Parties' Relationship and Project

As the court's findings indicate, the parties, during the course of the project, often ignored the terms of their Subcontract—or at least did not adhere to them—in many important respects.  Although both are sophisticated parties experienced in government contracting, they failed to pay much attention to the language of the Subcontract as the project proceeded.  Nonetheless, at trial and in their briefing, the parties focus more on the terms of the written contract between them.  The court thus discusses the contract and various modifications thereto in some detail.

The court's factual findings are as follows:

### 1.  BAE contracts with the Army to design and construct a new packaged boiler facility at the Radford Plant.

In May 2011, the United States Army ("Army") awarded BAE a contract (the "Prime Contract") to operate and maintain the Radford Army Ammunition Plant (the "Radford Plant" or "Plant").  (*See* J. Stip. of Facts & Exs. ["J. Stip."] ¶ 1, Dkt No. 206.)  At that time, the combined

---

[3]  In referring to trial testimony, the court uses the trial day as the transcript number.  For example, the transcript of Day 1 of trial will be cited as "Tr. 1."  The redacted trial transcripts are found at Dkt. Nos. 216–219 (Days 1 through 4), Dkt. Nos. 221–223 (Days 6 through 8), and Dkt. Nos. 230–31 (Days 5 and 9).  Unredacted trial exhibits, whether Joint Exhibits (J. Ex.), plaintiff's, or defendant's exhibits, are all on encrypted flash drives, which are stored in a locked location in chambers.  Additionally, pagination of some of the documents is different than the page numbers assigned by the court's CM/ECF system.  For those documents, the court uses the page numbers on the CM/ECF system.

heating and power plant ("CHPP") at the Radford Plant had five 1940s-era coal-fired boilers. (Task Order ("TO") 29, J. Ex. 3 at 8.)

On January 31, 2013, the United States Environmental Protection Agency ("EPA") published a final rule concerning certain emission standards which, as applicable here, required the use of Maximum Achievable Control Technologies ("MACT") to mitigate air pollution.  The Army determined that the then-existing CHPP at the Radford Plant (*i.e.*, the coal-fired boilers) could not meet the newly promulgated emissions standards contained in that rule.  After a February 2013 report, the government concluded that the best solution for long-term environmental compliance was to design and construct a new natural gas-fired facility with gas turbines to replace the existing CHPP.  (TO 29 at 8.)  At the risk of large daily fines for delays, the CHPP needed to be MACT-compliant by January 31, 2017 (the "MACT deadline").

On December 19, 2013, the Army and BAE executed TO 29 to the Prime Contract (J. Ex. 3).  TO 29 required BAE to replace the coal-fired boilers at the Radford Plant with natural gas-fired boilers.  (J. Stip. ¶ 1.)  Initially, the Army requested that BAE design and construct a *temporary* natural gas-fired boiler facility at a particular location at the Radford Plant (the "temporary location")—so that the coal-fired facility could be decommissioned by the MACT deadline—while the Army Corps of Engineers would be tasked with the design-build services for a *permanent* CHPP at a different location at the Radford Plant (the "permanent location").

On February 25, 2015, the Army issued Modification ("Mod") 1 to TO 29, which directed BAE to execute a preliminary design analysis for mitigating existing "Central Heating and Power Plant Current Issues" (J. Stip. ¶ 3; J. Ex. 3), including a general, high-level assessment of the possibility of turning the temporary boiler facility project into a permanent

solution.[4]  On July 27, 2015, pursuant to Mod 1 to TO 29, BAE provided the Army with a

"Preliminary Design Analysis" report.  (J. Stip. ¶ 4; Pl.'s Ex. 17.)  In it, BAE recommended that

the Army approach the Virginia Department of Environmental Quality ("VDEQ") "to determine

if an at-risk start of construction on a new permanent steam-only plant, with future co-generation

add-on, is permissible," and, if so, to "immediately terminate the [Corps of Engineers plan] and

replace [it] with a plan for [BAE] to construct a new permanent steam-only plant . . . ."[5]  (Pl.'s

Ex. 17 at 20.)  In September 2015, BAE notified the Army that a permanent facility would take

twenty months to design and build.  (Pl.'s Ex. 466 at 7.)

> **2.  BAE solicits bids for the design and construction of a temporary facility; the Army cancels the CHPP effort and moves the BAE project to the "permanent" location.**

Given that the government had not yet communicated to BAE any formal decision to

implement only a *permanent* packaged boiler facility (*see* Tr. 8 at 23:8–14), BAE began a

competitive source selection for a subcontractor to design and construct the *temporary* facility.

On October 7, 2015, BAE issued a Request for Proposals ("RFP") for the design and

construction of the temporary facility.  (J. Stip. ¶ 5.)  That RFP included a Statement of Work

("SOW")[6] for a temporary facility at the temporary location.  In November 2015, after receiving

---

[4]  At trial, BAE's Program Director, Michael Bate, described his understanding of what the government wanted in issuing Mod 1 to TO 29 and what BAE provided in response.  As he understood it, "because the CHPP was so far behind, the government wanted BAE to look at a number of options to identify potential alternatives [or] stop gap measures for becoming MACT compliant in the Radford facility by 2017.  And so we were contracted . . . just under $247,000 to complete that analysis for temporary solutions.  So we provided a number of options for the government for them to analyze."  (Tr. 8 at 18:3–11.)

[5]  Bate testified that, at the time BAE issued this report, the government had not informed BAE that it had made any decisions to implement a permanent packaged boiler facility.  (*See* Tr. 8 at 23:8–14.)  Rather, the report provided "high level options [for] how that solution would start to take place."  (*Id.* at 23:16–19.)  In its work under Mod 1, BAE never completed a full design of either a temporary or permanent packaged boiler facility.  (*Id.* at 24:10–13.)

[6]  A SOW is a document that provides an outline of the contractor's required tasks for the work to be performed so that the contractor may clearly understand the government's (or, in this case, the prime contractor's)

multiple bids that did not include one from Fluor, BAE issued the same RFP to Fluor.  (J. Stip. ¶ 6.)

On December 10, 2015, in response to BAE's RFP, Fluor submitted an $11,027,964 proposal for the design, construction, and commissioning of the temporary boiler facility at the temporary location at the Radford Plant—of which $1,519,560 was for design and $9,508.402 was for construction.[7]  (J. Stip. ¶ 7; Pl.'s Ex. 78.)  The same day, the Army issued Mod 3 to TO 29, which was an undefinitized contract action ("UCA")[8] that set a "not-to-exceed" price ("NTE") for Phase 1 of the project—which included BAE's design of the temporary facility and ordering of long lead items.  (*See* TO 29 Mod 3, J. Ex. 3.)

On December 14, 2015, four days after BAE received Fluor's proposal (and after it had received proposals from all bidders), several BAE employees received an e-mail from Rosemary Hensley, an Army contracting employee, with the subject line "Package Boiler Location Change."  (Pl.'s Ex. 89 at 1; J. Stip. ¶ 8.)  In that e-mail, Hensley notified BAE that the government had "officially cancelled" the Corps of Engineers CHPP effort and that, as a result, the permanent location (which was previously occupied by the Corps of Engineers project) "is

---

needs for the project.  All SOWs in government contracts must include "a description of work to be performed; location of work; period of performance; deliverable schedule; applicable performance standards; and any special requirements (*e.g.*, security clearances, travel, special knowledge)."  *See* Federal Acquisition Regulation ("FAR") § 8.405-2(b).  (FAR are regulations that govern federal procurement of foods and services, 48 C.F.R. § 1.000 *et seq.*, and citations throughout this opinion will simply cite to the relevant section of Title 48 of the Code of Federal Regulations.)  In other words, the SOW identifies the job and directs the contractor specifically how to do it.  SOWs are usually contained in the project solicitation (here, the RFP) and then carried forward—as may be negotiated between the parties—into the final contract.  Once implemented into the final contract, the SOW (and any modifications thereto) provides the scope of the contractor's work.  Because parties look to the SOW as defining their responsibilities, the SOW (when used) is a key document.

[7] The construction costs referenced herein include costs for payment and performance bonds. Additionally, the court has rounded to the nearest dollar amount throughout this opinion.

[8] In government contracting, an "undefinitized contract action," or UCA, is "any contract action for which the contract terms, specifications, or price are not agreed upon before performance is begun under the action."  *See* FAR § 217.7401.  To "definitize" means to "agree[] on, or determine[e], contract terms, specifications, and price," thereby "convert[ing] the undefinitized contract action to a definitive contract."  *Id.*

now available for the installation of the package boilers currently on contract under [TO 29]."
(*Id.*)  As a result, Hensley, on behalf of the Army, requested that BAE "shift the location of the
package boiler project" to the permanent location, instructed BAE that "[a]ll design,
construction, installation and commissioning activities under the Interim Package Boiler Project
shall now be conducted based on the original targeted CHPP site [the permanent location]," and
clarified that, "[o]ther than the change in location, the scope of work remains unchanged."  (*Id.*)
Hensley also shared that "[i]t is the Government's understanding that this change will not impact
the project completion date of [January 31, 2017]" and told BAE to "[r]equest confirmation of
any cost impact as a result of this change."  (*Id.* at 1–2.)  However, at that time, BAE did not
receive any formal contract action from the Army to fund the change.  (Tr. 7 at 35:1–8.)

### 3. BAE employees discuss the change in location and the "path forward" with the subcontract award.

The trial evidence indicated that, shortly before Hensley formally notified BAE that the
project would be moved to the permanent location, multiple BAE employees were aware that
this change was likely, if not imminent.  For example, on the morning of December 14, 2015,
(hours before Hensley's e-mail), BAE project manager Jared Hendrick e-mailed Erin Phalen and
Michael Bate (both of BAE) and noted that "[t]he Gov. appears to be moving forward with
cancelling the CHPP which is expected to be followed with the direction to move to that building
site."  (Pl.'s Ex. 93 at 2.)  Hendrick continued:

> With that, we have the following options:
> - Award to Fluor at the current price to allow them to begin
>   working on the design and negotiate the changes to the new
>   site . . .
> - Work through the pricing changes ahead of award
> - Go out to all bidders (not recommended at all)
>
> With any option, we would need to proceed with the current
> proposal direction using the submitted prices from Fluor in order to

> meet our delivery time line.  We should be able to make the
> necessary pricing adjustments in time to include those without
> delay if we can get a meeting with Fluor today . . . .
>
> Please provide your feedback.
>
> Thanks.[9]

(*Id.*)

On December 16, 2015, after BAE had been formally notified of the change in location

for the facility, BAE Engineer Jeff Pierson e-mailed multiple other BAE employees about the

change.  (*See* Pl.'s Ex. 98.)  In that e-mail, Pierson opined that "[t]his change will involve a

[prime] contract mod in the future" and "will involve a contract change to the selected general

contractor who may be Fluor."[10]  (*Id.* at 2.)  Pierson then shared his view—which turned out to

be prescient—that "this future change should and will prevent/delay some elements of the

execution.  What I mean is that for example if we know the site is going to change then the

design for the current site must not be started (this has expense) but rather be directed toward the

actual site. This will actually become a delay to the general contractor and will have some cost or

schedule impact." (*Id.* at 3.)  Pierson also noted: "I don't see how we can go on contract and

then immediately and verbally tell the general contractor 'don't design or construct to this site

location just yet, but wait, we will direct you to a different location soon [. . .] .'" (*Id.*)

On or about December 18, 2015, BAE employees took multiple Fluor employees on a

walk-down tour of the temporary location at the Radford Plant to help finalize price, even though

---

[9]  Ultimately (as is described below), BAE pursued the first option—that is, BAE awarded the design subcontract to Fluor and endeavored to work through the pricing changes afterward.  On cross-examination at trial, Hendrick indicated that BAE chose this route, at least in part, because re-opening competition and rebidding the process "would have completely eviscerated [the] schedule on this project."  (Tr. 7 at 37:11–21.)

[10]  Notably, although it appears Fluor was a top contender for the subcontract, at this point BAE had not yet awarded Fluor the subcontract.

BAE had already learned that the facility would not be built at that location.[11]  (*See* Pl.'s Ex. 99 (referencing the walk-down tour).)  After taking the tour, Fluor revised its pricing proposal to $11,569,176—of which $1,516,476 was for design and $10,052,700 was for construction.  (J. Stip. ¶ 9; Pl.'s Ex. 99.)

### 4. BAE awards Fluor the design and construction work for the boiler facility at the temporary location; the parties negotiate the change from temporary to permanent.

On December 30, 2015, BAE awarded Fluor the Subcontract for only the *design* of the boiler facility at the temporary location via Purchase Order No. ELP-122115-02, at a firm-fixed-price[12] of $1,519,561  (J. Stip. ¶ 10.)  BAE selected Fluor based on the proposal it had submitted earlier that month.  The Statement of Work for the temporary facility that was provided as part of the RFP documents (the "Original Statement of Work" or "Original SOW") was incorporated into the Subcontract.  (J. Stip. ¶ 11.)  Fluor executed the Subcontract the same day.  (J. Stip. ¶ 12; Subcontract, J. Ex. 1.)

On the morning of December 31, 2015, (the morning after BAE received the executed Subcontract from Fluor), BAE informed Fluor of the Army's decision to cancel the Corps of Engineers CHPP program and direction to change to the permanent location.  (J. Stip. ¶ 13.)

---

[11] Ironically, on cross-examination at trial, Hendrick testified that he withheld from Fluor the fact that the location of the facility was changed "to maintain the integrity of the procurement." (Tr. 7 at 14:6–17.)  Fluor views BAE's withholding of information before they entered into the Subcontract as fraudulent, and much of the information known to BAE and not conveyed to Fluor was the basis for Fluor's fraud-in-the-inducement claim, which the court dismissed as time-barred.  Further, and as discussed in the court's opinion, Fluor could have declined to agree to the changes that converted the location and permanency of the facility, but it instead actively sought that work.

[12] A "firm-fixed-price" contract is an agreement that sets forth "a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract."  *See* FAR § 16.202-1.  This type of contract "places upon the contractor maximum risk and full responsibility for all costs and resulting profit or loss."  As a result, it "provides maximum incentive for the contractor to control costs and perform effectively and imposes a minimum administrative burden upon the contracting parties."  *Id.*  Accordingly, in a firm-fixed-price contract, unexpected changes like increasing costs or the contractor needing to spend more on raw materials have no bearing because the price is set and not subject to change—unless noted explicitly in the original agreement.

Specifically, Jared Hendrick[13] of BAE wrote the following to Roy Harris of Fluor:

> Good morning Roy, I received a note last night from Erin [Phalen] that we now have a fully executed contract. With that I would like to hit the ground running. There are several key elements that we need to discuss immediately . . . . *Next, we have a big change from the Gov to incorporate*. They have officially cancelled the Corp or [sic] Engineers program to build a new power house. In doing that they have issued instructions to us to move the building site to the previous Corp [sic] location. In doing that we need to consider the structure and equipment arrangement to be headed toward a long term solution as opposed to the 2 year temp solution. Our team is already putting together the [e]ffects of such a move. We need to get your group fully established and engaged on this issue.

(Pl.'s Ex. 118 at 1–2.)  Fluor received this notification before it had begun any work under the Subcontract.  The Subcontract's disputes clause required Fluor, though, to "diligently proceed" with performance "as directed by BAE" in the event of a dispute.  (Subcontract Changes, 3a (second a) and 3(m) Disputes, 19(A).)  From this, Fluor argues that it could not have walked away from the Project without breaching the Subcontract.  The court is not convinced that is true, given the significant changes that were being made.  Regardless, the court finds that Fluor did not want to walk away from the Project after learning it would be for the long-term facility.  To the contrary, it wanted the work.  (*See* Pl.'s Ex. 122.)

On January 15, 2016, BAE issued to Fluor an initial addendum to the Original SOW ("SOW Addendum Rev. 0") and requested that Fluor submit cost proposals for the design work scope and construction work scope to account for the change in location and to make the facility permanent, which included increasing the service life of the boilers.  (J. Stip. ¶ 14; J. Ex. 1, SOW Addendum Rev. 0.)  Despite the significant changes to the Project, Fluor was not consulted regarding SOW Addendum Rev. 0.  (Tr. 7 at 56–57.)  Hendrick of BAE again directed Fluor –

---

[13]  As discussed *infra* in discussing the parties' legal claims, BAE contends that Hendrick (and others with BAE), who frequently directed Fluor, were not authorized to direct Fluor to change its designs and work.

this time to begin designing the permanent facility and to incur no cost on a temporary facility. (Tr. 7 at 45:3–14.)

Fluor emphasizes that it was not consulted about this change, but Fluor, nonetheless, did not object to proceeding with the revised work as a change order. (*See* Tr. 5 at 139:3–20.) Indeed, after it was fully informed of the change, Fluor requested further assurances that it would also be awarded a subcontract for the *construction* work. (*See* Pl.'s Ex. 122.) Accordingly, on January 15, 2016, BAE issued a notice of intent to award the construction work to Fluor. (*See* J. Stip. ¶ 16; Pl.'s Ex. 136.)

On January 21, 2016, Fluor submitted a revised change proposal for the changes in design resulting from the change from the temporary to permanent facility. (*See* Pl.'s Ex. 142.) Fluor proposed a $336,248 increase in cost to change its design. (J. Stip. ¶ 18.) As discussed later herein, BAE accepted this change proposal in September 2016 in Mod 3 to the Subcontract. (J. Stip. ¶ 29, J. Ex. 1, Mod 3.)

Negotiations between BAE and the Army for costs of the permanent facility began on or about February 29, 2016. (*See* Pl.'s Ex. 234.) On March 7, 2016, the Army issued Mod 6 to BAE's Prime Contract. (*See* J. Ex. 3.) Mod 6 included a UCA to BAE for the construction phase of the project. (J. Stip. ¶ 19.) On March 12, 2016, BAE submitted a change proposal to the Army for the design portion of the permanent facility. (J. Stip. ¶ 20.)

In March 2016, the parties corresponded regarding the type of change proposal that would be required for the change in location and to make the facility permanent. Kelly Jones of BAE informed Tim Dixon of Fluor that the change proposal "will need to be submitted as a delta" from the original proposed price. (Def.'s Ex. 581.)

On March 23, 2016, BAE issued Mod 1 to the Subcontract (J. Ex. 1, Mod 1), which Fluor

12

accepted on March 31, 2016.  (J. Stip. ¶ 21.)  Mod 1 modified the Subcontract to include the

construction and commissioning of a *temporary* facility.  It also extended the deadline for

performance of the construction of the facility from June 30, 2016, to January 31, 2017.  (J. Ex.

1, Mod 1.)  Mod 1 included the same price for the construction of the temporary facility as Fluor

had proposed in its revised fixed price proposal from December 18, 2015.  (*Compare with* Pl.'s

Ex. 99.)  The next day, the parties executed Mod 2 to the Subcontract.  (J. Stip. ¶ 22; J. Ex. 1,

Mod 2.)  Mod 2 modified the Subcontract to change the scope of the design phase by moving it

to a new location and making it a permanent facility.  Mod 2 also consolidated multiple line

items into two firm-fixed-priced line items—one for design and one for construction—

reaffirming the prices agreed to in Mod 1.  (*Id.*)

On April 4, 2016, Fluor submitted its first cost proposal for construction of the permanent

facility in the amount of $27,490,300, of which $1,810,148 was for design costs and $15,627,452

was for additional construction costs resulting from the change from the temporary facility to the

permanent facility.  (Pl.'s Ex. 230; J. Stip. ¶ 23.)  As discussed in the next section, this proposal

was not based on the changes reflected in SOW Addendum Revision 4, which occurred later.

(*Id.*)  BAE did not accept that cost proposal.  Nonetheless, in an effort to complete the project as

early as possible and meet the MACT compliance deadline, Fluor commenced construction

activities beginning in the third week of April 2016 for a permanent facility (*see* Tr. 2 at 57:17–

18), while the parties continued to negotiate a price for the permanent construction.  Despite

beginning construction then, Fluor was not authorized to submit invoices for construction of the

permanent facility until November 29, 2016, when Mod 4 was signed, at which point it was

allowed to do so retroactive to April 1, 2016.  (J. Ex. 1 (Subcontract Mod 4).)

At least one BAE witness—Kelly Bate—testified that BAE did not want to execute a

Subcontract modification with Fluor to construct the Permanent Facility until BAE reached an agreement with the Army.  (Tr. 6 at 66:8–13.)

### 5.  The parties finalize Statement of Work Addendum Revision 4.

Between January and May 2016, BAE and Fluor negotiated a final SOW addendum to account for the change in location and additional changes to allow for the facility to be made permanent.  These discussions culminated in the Statement of Work Addendum Revision 4 ("SOW Addendum Rev. 4") (J. Ex. 1, SOW Addendum Rev. 4), which the parties executed on May 5, 2016.  (J. Stip. ¶ 24.)  The Original SOW, as modified by SOW Addendum Rev. 4, established what the parties have referred to as the "Base Scope" for the permanent boiler facility project.[14]

### 6.  Fluor submits its June and October 2016 change proposals; the parties agree to Mod 4 to the Subcontract.

After continued negotiations with BAE, on June 17, 2016, Fluor submitted a change proposal for changes stemming from SOW Addendum Rev. 4 (the "June 2016 Proposal").  (*See* J. Stip. ¶ 25.)  The June 2016 Proposal was in the amount of $24,942,759, of which $11,720,654 was for changes attributable to SOW Addendum Rev. 4.  (*See id*. ¶ 26.)  The June 2016 Proposal also included $3,169,405 in other cost growth which was not attributable to SOW Addendum Rev. 4.  (*See* Pl.'s Ex. 338 at 3.)  The parties at least tentatively agreed to negotiate those costs, as they "largely resulted from errors or miscommunications in the bid process, driven by an unusually aggressive proposal schedule," and BAE could not submit those costs to the Army. (*See* Pl.'s Ex. 376 at 54, 69.)

---

[14]  The document states: "This document is an addendum to the original RFP document for the TPBF [Temporary Package Boiler Facility] that outlines the changes that are required due to the relocation of the TPBF to the [new] building site and changing the facility from a temporary to a permanent facility."  (*See* J. Ex. 1, SOW Addendum Rev. 4.)

On July 5, 2016, the Army issued Mod 10 to TO 29 to the Prime Contract.  As an unpriced change order ("UCO"),[15] Mod 10 set the NTE for construction and commissioning work resulting from SOW Addendum Rev. 4 at $14,382,630.  (J. Stip. ¶ 27.)  The NTE in Mod 10 was based upon Fluor's June 2016 Proposal.  (*See* Tr. 8 at 40:6–8.)  As explained by BAE, the difference between the $14,382,630 and the approximately $11.7 in Fluor's June 2016 proposal was BAE's "markup in accordance with approved rates and other prices unrelated to Fluor's construction of the permanent facility."  (BAE Redacted Post-trial Br. ("BAE Br.") 16 n.7, Dkt. No. 228.)

After the Army issued Mod 10, on July 14, 2016, BAE proposed a draft UCA to Fluor.  (*See* Pl.'s Ex. 383.)  This draft UCA set an NTE for the work resulting from SOW Addendum Rev. 4 (and being billed through subcontract line item number ("SLIN") 003) at $11,720,654—which is the exact amount Fluor attributed in its June 2016 Proposal to SOW Addendum Rev. 4.  (*Compare id. with* J. Stip. ¶ 26.)  However, several hours after BAE provided Fluor with the draft UCA, Lura Lewis of Fluor e-mailed her colleagues expressing concern about the implications of signing the UCA.  She wrote: "I do remember Kent [Smith's] concern that if we sign the UCA, we are agreeing to build the permanent plant, thus losing leverage in negotiating price."  (*See* Def.'s Ex. 601 at 1.)  In the same e-mail, Lewis acknowledged that BAE had informed Fluor of the timeline for definitization of the UCA: "Kelly [Bate] told me BAE intends to definitize us after they definitize with Rock Island in November time frame.[16]  I expressed

---

[15]  A change order is "a written order, signed by the contracting officer, directing the contractor to make a change that the Changes clause authorizes the contracting officer to order without the contractor's consent."  *See* FAR § 2-101.  In turn, an unpriced change order, or "UCO," is a change order that defines the work to be performed, with the price (*i.e.*, the adjustment to the contract price) to be negotiated later.

[16]  Lewis explained that Rock Island meant the Rock Island Army Contracting Command, BAE's customer, and the email meant that BAE would not definitize with Fluor until after it definitized with the government.  (Tr. 1 at 113–14.)

my concern at the timing but not sure they can get around that." (*Id.*)

On July 8, 2016, BAE issued a Cost and Price Analysis ("CAPA")[17] of Fluor's June 2016 Change Proposal, wherein BAE determined that 72% of Fluor's proposed costs that were submitted to the Government were fair and reasonable, 4% were unsupported, and approximately 24% of the costs (attributed to "Growth Costs") were subject to discussion between the parties.[18] (*See* Pl.'s Ex. 377 at 19–20; *see generally* Pl.'s Ex. 976.)  This CAPA was included in BAE's proposal submission to the Army.  (J. Stip. ¶ 28.)

On September 1, 2016, the Parties executed Mod 3 to the Subcontract.  (J. Stip. ¶ 29; J. Ex. 1, Mod 3.)  Mod 3 set a firm-fixed price for designing and constructing the work in the Original SOW, but intended to be applied to the permanent facility at $11,905,424.  (J. Ex 1, Mod 3.)  This amount consisted of $1,852,724 for the design of the permanent facility, for which Mod 3 authorized payment, and $10,052,700 for the construction costs.  (J. Ex. 1, Mod 3.)  Although the construction costs were technically still "allotted" to the temporary facility at that time, that was only because the parties had not yet contracted for construction of the permanent facility.  Effectively, doing so provided a funding mechanism so that Fluor could start invoicing for work.  At no point did either party think any of that money would be put toward a temporary facility, however.

As part of the continuing negotiations to establish a price for the change, on October 3, 2016, BAE and Fluor discussed—and appeared to reach at least a tentative agreement—to divide between them the $3,169,405 in forecasted costs not associated with the work in SOW

---

[17]  A CAPA is a review of the cost and pricing data submitted by the contractor to ensure that the final, agreed-upon costs/price are fair and reasonable.

[18]  The final page (page 20) of Plaintiff's Exhibit 377, which is a summary of the BAE analyst's findings, appears to contain an error in identifying that *74%* of Fluor's costs were supported and appropriate.  That figure differs from the preceding page of the exhibit and the 74% figure results in a total amount of 102% for that page.  Thus, the court believes the 72% on the prior page is correct.

Addendum Rev. 4.  They discussed that BAE was to pay $1,200,000 and Fluor was to pay the remaining $1,969,405 of what the parties referred to as "other bucket" items.  (*See* Def.'s Exs. 62, 63.)  Although Fluor appeared to agree to the division of those bucket items in an October 3, 2016 letter, (Def.'s Ex. 63; Tr. 1 at 222:14–223:8), that tentative agreement was never incorporated into any formal agreement between the parties.  As Lewis of Fluor explained, everyone understood at the time that Fluor was agreeing to BAE's offer of $1.2 million for the bucket items as part of a definitive agreement on price, which was never reached.  Further, even in the letter where Fluor seemed to agree, it expressly reserved its right "to continue to submit change proposals as events warrant."  (Def.'s Ex. 63)

On October 20, 2016, Fluor submitted another cost proposal (the "October 2016 Proposal") based on a "bottoms-up" estimate to complete the project.[19]  (J. Stip. ¶ 30; Pl.'s Ex. 505.)  The October 2016 Proposal was in the amount of $27,051,980, of which $13,840,184 was for changes attributable to SOW Addendum Rev. 4 and $3,169,405 represented "other bucket" costs.  (J. Stip. ¶ 31; Pl.'s Ex. 505.)[20]  Several days earlier, BAE had communicated to Fluor that it believed Fluor's bottoms-up approach was neither "reasonable, nor supportable" and not defensible before the Army because aspects of the proposal were not tethered to the change to a permanent facility as reflected in SOW Addendum Rev. 4.  (Def.'s Ex. 605 at 2.)  Specifically, Kelly Bate of BAE observed that "in Fluor's proposal there is no adjustment for the items which

---

[19]  The "bottoms-up" approach is an estimating technique that estimates the lowest-level activities in a project first and then aggregates up to higher levels. In other words, bottoms-up estimating estimates an overall value by estimating values for smaller components and using the sum of these values to reach the overall value. (*See* Tr. 5 at 55 (expert testimony of Robert Krafft explaining approach).)  This stands in contrast to the "top-down" approach, which estimates at the highest level first and then breaks the estimate down into lower levels.  BAE describes the approach, as used by Fluor, as "simply subtracting the fixed prices agreed on through Mod 3 from the estimated total costs for the work in the Original SOW as revised by SOW Addendum Rev. 4." (BAE Post-Trial Br. ¶ 33.)

[20]  In the end, BAE ultimately paid Fluor more than the amounts it had sought in its June and October 2016 proposals. (*See* J. Stip. ¶ 48.)

remain unchanged but simply have cost overruns except for the 'investment' line items both parties agreed to."  (*Id.*)  She continued:

> I've tried very hard over the weekend to get myself in a place where I can defend this, and I simply cannot. The changes we're waiting on . . . relate to price only, and I don't expect them to address this underlying concern. We again find ourselves in a position where our submission to the [government] is delayed based on the pricing approach, and this impacts our ability to obtain critical funding. I'm very concerned about Fluor's ability to continue work after November, based on the funding available from the base contract. I sincerely need your help.

(*Id.*)

Despite those concerns, on October 21, 2016, BAE issued a CAPA of Fluor's October 2016 Proposal.  (J. Stip. ¶ 32.)  In the CAPA, BAE acknowledged that there were several challenges with analyzing the proposal as Fluor presented it.  Among them was that "[b]ecause Fluor compared internal estimates (base contract) to grounds up proposals (change order), the changes are comingled with original scope."  (Pl.'s Ex. 511 at 7.)  Ultimately, outside of the "other bucket" costs, BAE "determined that the [change proposal] is fair and reasonable" (*id.* at 18) with the exception of $476 in costs that were deemed "unsupported" (*see id.* at 12).  BAE also represented to the government that BAE's October 2016 change proposal complied with Federal Acquisition Regulation (FAR) § 15.408 in all respects.[21]  (Tr. 6 at 118.)

On October 24, 2016, BAE negotiated its change proposal, including Fluor's costs, with the Army.  (*See* Pl.'s Ex. 976 at 2–19.)  Specifically, BAE represented that it "believes our 10/24 proposal revision, based on Fluor's October 2016 proposal revision, addresses all of the Government's concerns regarding our proposal's qualification status."  (*Id.* at 2.)  BAE also noted that "based on current funding limitations, Fluor will be unable to invoice beginning in

---

[21]  As noted *supra* n.6, all references to the FAR cite only to the applicable section number from Title 48 of the Code of Federal Regulations.

November 2016" and that "[i]n order to avoid a detrimental impact on the [project] and MACT compliance, BAE Systems must have a definitized and executed contract by 30 November 2016." (*Id.* (emphasis in original).)  Nevertheless, the Army rejected the proposal (*see* Tr. 8 at 45:13–21), and BAE likewise rejected Fluor's October 2016 proposal (*see* J. Stip. ¶ 33).

On November 29, 2016, to make sure Fluor's construction work was funded while the parties negotiated Fluor's October 2016 Proposal, the parties entered into Mod 4 to the Subcontract.  (J. Stip. ¶ 34; J. Ex. 1, Mod 4.)  Mod 4 incorporated the first UCO issued by BAE to Fluor, dated November 22, 2016.  (J. Stip. ¶ 35.)  Mod 4 added a new subcontract line item— SLIN 003—for the change in construction to the permanent facility and established an NTE ceiling price of $11,720,652 for SLIN 003.  (*See* J. Ex. 1, Mod 4.)  Mod 4 also included language that made its terms retroactive to April 1, 2016.  (J. Stip. ¶ 36.)  This was included to ensure that Fluor could invoice for work performed going back to that date.  Thus, after the parties entered into Mod 4, the total NTE on the project, for all three line items—representing the design and Base Scope NTE—was $23,626,076.  This consisted of the firm-fixed price of $11,905,424 for the design and the initial authorization for construction and the NTE set for SLIN 003—of $11,720,652.

### 7. The parties attempt to definitize Mod 4, and Fluor submits the January 2017 Proposal.

On December 12, 2016, the Army unilaterally definitized its UCO with BAE at $14,382,630, which was the NTE price from Mod 10 to TO 29 (J. Stip. ¶ 37), that was itself based upon Fluor's June 2016 Proposal (*see* Tr. 8 at 40:6–8).  That price was lower than Fluor's October 2016 Proposal.  (*Compare* J. Stip. ¶ 37 *with* J. Stip. ¶ 31.)

On January 9, 2017, the parties met to discuss definitization of Mod 4.  (J. Stip. ¶ 38.)  In that meeting, Fluor stated that it could not definitize at the $11,720,652 NTE set by Mod 4 (*see*

Def.'s Ex. 703 at 2 ("Problem is, we can't definitize at 11.7")) and acknowledged that only $350,000 of its approximately $2 million in cost growth at the time could be attributed to changes to the scope of work since finalizing SOW Addendum Rev. 4.  (*See id.* ("[W]e're 2M upsided [sic] down, and we can't continue down that path. And we only think of that 2M delta, we can tied [sic] 350k to changes.").)[22]  Fluor also took the position that the parties' agreement to divide up the "other bucket" costs was never executed.  (*See* Def.'s Ex. 703 at 2 ("As far as we're concerned, that agreement was never executed.").)  In the end, the parties did not reach an agreement at that meeting to definitize Mod 4.  (J. Stip. ¶ 38.)

On January 21, 2017, Fluor submitted another proposal (the "January 2017 Proposal"). (J. Stip. ¶ 39; Def.'s Ex. 609.)  This proposal was for a firm fixed price of $20,172,630 for changes alleged to be solely attributable to SOW Addendum Rev. 4.  Like the October 2016 Proposal, the January 2017 Proposal was based on a "bottoms up" approach.  (J. Stip. ¶ 39.) Unlike its June 2016 Proposal and October 2016 Proposal, Fluor's January 2017 Proposal did not separate out the "other bucket" costs that the parties had agreed to share.  (*See* Def.'s Ex. 609 at 4.)  On January 26, 2017, BAE offered to definitize Mod 4 at its NTE amount (which was based on Fluor's June 2016 Proposal (*see* Pl.'s Ex. 625) and was ultimately used by the Army to definitize its UCO with BAE), but Fluor declined.

### 8.  The MACT compliance deadline passes, Fluor suspends performance, and the parties agree to Mod 7.

By January 31, 2017, (the contractual completion date set by Mod 1 and the MACT compliance deadline), the project was not complete, and the parties had not yet agreed on a

---

[22]  *See also* Def.'s Ex. 607 at 2 ("As we discussed in our meeting on Monday, January 9, 2017, Fluor has experienced significant cost growth in constructing the permanent facility that cannot be attributed to new changes to the work, therefore we cannot tie cost growth to changes experienced since our June proposal, to new change proposals.")

definitive fixed price for the changes attributable to SOW Addendum Rev. 4.  On February 9,

2017, Lewis (Fluor) wrote to Kelly Bate (BAE) the following:

> Dear Ms. Bate,
>
> Fluor's costs have reached the $11,720,652 identified in Mod 4,
> the undefinitized change order (UCO). Fluor requests BAE
> negotiate a final price for construction of the permanent package
> boiler facility, as defined in the SOW Addendum Rev 4 referenced
> in the UCO, or increase the UCO to $20,188,308.
>
> Fluor hopes to resolve the final price with BAE soon and is willing
> to continue negotiations. However, *absent of one of the above
> actions, Fluor intends to suspend work in 5 calendar days* as
> authorized by the UCO[23].

(Def.'s Ex. 594 (emphasis added).)

On February 15, 2017, Fluor suspended performance, demobilized from the project, and

informed BAE that it believed its obligation to continue performing under the Subcontract had

expired.  (*See, e.g.*, Tr. 1 at 151:4–152:4; J. Stip. ¶ 40.)  On February 16, 2017, BAE issued a

Cure Note to Fluor, in which Robert Creed (BAE's Director of Procurement) stated BAE's view

that Fluor "is in default of its contractual obligations of the [Subcontract]," that Fluor "is

prohibited from suspending work and is obligated to continue performance pending dispute

resolution," and that "unless such condition is cured . . . BAE Systems may terminate the

[Subcontract] for default."  (*See* Def.'s Ex. 36; J. Stip. ¶ 41.)

 Between February 15 and 18, 2017, the parties reached an agreement in principle that

included, among other things, amending the Mod 4 UCO by increasing the NTE amount by $8

million, subject to certain conditions (the "Amended UCO") (*see* Tr. 5 at 205:7–23), and Fluor

---

23   Article IV.A of Mod 4 provides that "[i]n the event that the parties do not execute a definitive
Agreement by the definitization date agreed upon in Attachment 2,"—*i.e.*, within 180 days of the starting date of the
UCO or before completion of 75% of the work, whichever occurred first—"the UCO will automatically terminate
on said date unless a written modification is issued extending the term of the UCO."  (J. Ex. 1, Mod 4 at 6.)

remobilizing to the project to resume work on February 18.  This agreement was ultimately

memorialized and executed—on March 29, 2017—as Mod 7 to the Subcontract.  (J. Ex. 1, Mod

7; J. Stip. ¶ 42.)

Mod 7 established a new NTE ceiling price of $19,720,652[24] for SLIN 003.  (*See* J. Ex.

1, Mods 4, 7.)  The parties agreed in Mod 7 that Fluor would "promptly submit a change

proposal in accordance with FAR [§] 15.408, Table 15-2 Section III," and it also "reserve[d] and

acknowledge[d] Fluor's right to submit a claim, change proposal, or requests for equitable

adjustment for costs incurred for work performed outside of scope."  (J. Ex. 1, Mod 7, ¶ 2, J.)

The parties also agreed that Fluor would "assist [BAE] in negotiations with the United States

Government ("USG") for the recovery of costs detailed under the UCO and the definitized

modification to the Subcontract," including by "provid[ing] [BAE] with resource support,

including Fluor financial and contracts personnel, to collaboratively work with [BAE] in

preparing a proper Request for Equitable Adjustment to the USG for qualifying efforts under the

UCO and for any changes requested by Fluor that are outside the scope of the Modified

Subcontract."  (*Id.*)  The parties further agreed that "any costs not recoverable from the USG will

be negotiated between the parties in good faith" and that "[p]ayment to Fluor for work performed

under [SOW Addendum Rev. 4] or any changes is not dependent upon recovery by [BAE] of

costs from the USG."  (*Id.*)

On March 30, 2017, one day after Mod 7 was executed, Fluor submitted an Application

and Certification for Payment, Invoice No. 011-06, seeking payment for $12,180,358, which

included the $6 million that BAE agreed to immediately pay Fluor in Mod 7.  BAE paid Fluor

---

[24]  In its summary judgment ruling, the court confirmed that the UCO, as revised by Mod 7, imposes an
NTE at this amount for BAE's liability for Fluor's Base Scope work, but reserved ruling as to whether BAE may
ultimately enforce that NTE against Fluor given Fluor's claim that BAE breached the Subcontract first.  (*See* Dkt.
No. 201 at 13.)

the full amount sought in this invoice.  (J. Stip. ¶ 43.)

On May 7, 2017, more than three months beyond the deadline, the project achieved MACT compliance with the shutdown of all coal-fired legacy boilers.  (J. Stip. ¶ 44.)  On October 20, 2017, the project reached substantial completion.  (J. Stip. ¶ 46.)

### 9.  Fluor submits the August 2017 and August 2019 Proposals.

On August 15, 2017, Fluor submitted a change proposal (the "August 2017 Proposal") in the amount of $50,060,614, which included $33,230,509 in Base Scope costs, $15,732,472 in costs sought through Project Change Notices ("PCNs"), and $1,097,633 in proposal preparation costs.  (J. Stip. ¶ 45; Pl.'s Ex. 800.)  In the August 2017 Proposal, Fluor requested that BAE (1) definitize the UCO at Fluor's proposed firm-fixed price; (2) adjust the Subcontract price for the PCNs which exceeded the scope of SOW Addendum Rev. 4; and (3) compensate Fluor for the changes and Base Scope work for which it had not yet been paid.

On October 26, 2017, BAE's Procurement Representative, Catherine McGraw Hoffa, denied Fluor's August 2017 Proposal.  (*See* Pl.'s Ex. 843.)  Specifically, according to Hoffa, "[t]he primary inadequacy found" was that "[t]he Proposal does not include the required elements of FAR [§] 15.408, Table 15-2 Section III.  Fluor must distinguish between costs allocable to the original version of the SOW, as opposed to costs that were incurred as a result of the change of the SOW from the original version to Revision 4, Fluor's proposal does not distinguish between these costs.  Fluor is only entitled to costs associated with changes to the original contract. Fluor must explain its entitlement to its claims for compensation, i.e., identify the changed work scope, and the quantum associated with such changes."  (*Id.* at 1.)[25]

---

[25]  Although BAE asserts in its briefing that the PCNs were not timely submitted, Hoffa's letter to BAE did not mention untimeliness as a reason for denying the proposal.  Similarly, BAE did not object to the August 2017 changes on the ground that it did not have notice of the changes or that the PCNs lacked authorization from a designated contract person.  (Tr. 3 at 210–11.)

On August 12, 2019, at the request of BAE, and because Fluor's August 2017 Change Proposal included estimates of certain costs, rather than actual costs, Fluor submitted an updated change proposal to capture its updated actual costs (the "August 2019 Proposal").  (J. Stip. ¶ 47.) The August 2019 proposal sought $50,254,837, including $35,459,111 in Base Scope costs and $12,332,181 in costs sought through PCNs.  (J. Stip. ¶ 47.)

To date, BAE has paid Fluor $29,626,076 for its work on the Facility.  Of that payment, $1,852,724 was for design and $27,773,352 was for construction.  (J. Stip. ¶ 48.)  As of the date of Fluor's complaint, the parties had not agreed on a final price for the construction work.  BAE has not paid Fluor for any of the PCNs.  (J. Stip. ¶¶ 47–48.)

As to a limited number of the PCNs (PCNs 8, 16, 33, 34, and 36), BAE has stated that it found "no inadequacies," but it still has not paid those.  As to others, Fluor's experts have since determined that the PCNs actually sought reimbursement for work that were part of the Base Scope work, and so, while they might be compensable as part of the NTE price set in mod 7, they are not properly considered "changes" for which Fluor can seek reimbursement for *over* the NTE price.  In this litigation, Fluor contends that twenty-nine of its PCNs fall outside the Base Scope of Work and that it is entitled to almost $9.7 million in damages for those PCNs (or portions of them).[26]

### 10.  Changes to designs and other work during the Project

The contract sets forth certain requirements and certain ways in which changes to the work should be handled, and the court discusses these in detail as part of its analysis of Fluor's

---

[26]  The 29 PCNs are PCNs 6-12, 14, 16-21, 23-24, 33-34, 36-42, and 45-48.  A number of the PCNs that Fluor originally submitted to BAE it has since acknowledged (directly or through its experts, Fecke and Travis of Exponent) are not recoverable either because they were part of the Base Scope work (and thus not recoverable beyond the NTE) or because the additional costs were caused by mistakes by Fluor or its subcontractors.  These include all or portions of PCNs 10, 12, 14, 21, 24, 25, 31, 32, 37, 38, 40, 42, 43, 44, 46, 47, 49, 50, 51.  (*See* Pl.'s Exs. 972, 800.)  Fluor has made clear that is it not now seeking reimbursement for any parts of any PCNs that fall into those categories.

PCN claim *infra*.  In general terms, the contract required that Fluor could recover for changed aspects of the construction only if it obtained authorization from specific individuals regarding the change and submitted written notice to BAE about the changes within certain windows of time.  (Subcontract §§ 3(a), (c)–(d), (f), J. Ex. 1; *see also* FAR § 52.243-4(b), (d) (incorporated by reference into the Subcontract).)

These provisions, while followed on occasion, were largely ignored by both parties, as BAE has admitted.  First of all, BAE had no requirement that its technical personnel obtain approval before announcing changes to the work or even forwarding revisions to the SOW for the Project.  (Tr. 6 at 24–25.)  And throughout the project, BAE's technical representatives directed Fluor to perform changed and extra work.  (Tr. 2 at 21–26.)  Even after the permanent design was complete, BAE continued to direct Fluor to revise already constructed work to accommodate the preferences of BAE's technical personnel.  (Tr. at 28–29.)  Further, at times, BAE's technical representatives also communicated directly with Fluor's subcontractors and directed or approved changes to the work.  In some circumstances, Fluor became aware of these changes or directions only when it received change orders from its subcontractors.  (Tr. 6 at 87–90.)

## B.  Factual Disputes That Play an Important Role in Evaluating Legal Claims

In addition to the foregoing factual findings, it is necessary to resolve several additional key factual issues in order to address the parties' claims.  The court lists them below, and it discusses and resolves these issues in the context of discussing the parties' legal claims and arguments, in conjunction with the court's conclusions of law.

1. Did Fluor's August 2017 and August 2019 proposals comply with the FAR, as required by Mod 7 to the Subcontract?  Relatedly, did Fluor breach the contract by failing to provide financial resources and personnel so BAE could recover costs from the Army?

2.  Did BAE waive the contractual provisions regarding changes to the work and/or did the parties' course of dealing alter those provisions?  If so, is Fluor entitled to payment for any or all of its PCNs?

3.  Which, if either, of the parties committed a first material breach, thereby precluding the breaching party from suing on the contract?

4.  How much of the delay on the Project, if any, is attributable to each party?

5.  What portions of Fluor's work, if any, were defective and resulted in damages to BAE?

## IV.  CONCLUSIONS OF LAW

Before the court are competing breach-of-contract claims.  There are four components to Fluor's claims, and two to BAE's.  To provide a roadmap of the court's rulings, the court lists here each party's claims, the opposing party's basic defenses, and a brief summary of the court's ruling as to each.  The rulings will be explained in more detail *infra* at Sections IV.B. and IV.C.

### A.  Overview of Fluor's Claims and Court's Conclusions as to Same

Before turning to an overview of Fluor's claims, the court briefly points out that Fluor's damages calculations have changed slightly over time.  One of Fluor's experts, Robert Krafft, explained some of the reasons for the change.  (*See, e.g.*, Tr. 5 at 24–25; *see generally* Tr. 5 (Krafft's testimony).)  For example, the amount Fluor sought at trial does not include additional costs that Fluor incurred in the amount of about $4.6 million.  (Tr. 5 at 41–42.)  Fluor is not seeking those additional costs either because, according to the analysis of Fluor's experts from Exponent, those amounts were the fault of Fluor or its subcontractors or fell within the Base Scope work and were above the NTE.  *See also supra* n.26 (explaining same).

Ultimately, Krafft testified that the total amount Fluor seeks to recover in this lawsuit, is

$20,259,065.[27]  (*Id.* at 25, 81; *see also* Pl.'s Ex. 975 (breaking down by PCN, showing proposal

costs, and listing total payments received from BAE).)  Krafft also explained that, if the court

applies the not-to-exceed amount on the construction costs, then the total amount Fluor seeks is

$13,930,320.  (Tr. 5 at 81.)  Of that amount, Fluor seeks $9,665,684 for its unpaid PCNs, not

including proposal costs. [28]  The remainder of that amount is attributed to $2 million for Base

Scope work, up to the NTE amount, and $2,264,627 in proposal costs.  (Pl.'s Ex. 975.)

     Fluor's claims, and an overview of the court's rulings, are as follows:

    1.  Fluor's Base Scope Claim

> Fluor seeks, at a minimum, $2 million in Base Scope costs up to the $19.7 NTE price,
> but also seeks additional amounts beyond the NTE.  BAE contends that the NTE bars
> recovery of any costs above the NTE for any Base Scope work.  BAE further argues,
> though, that Fluor cannot recover the $2 million up to the NTE price because of its
> failure to submit change proposals that complied with FAR § 15.408, Table 15.2
> Section III.  BAE also contends that Fluor's failure to comply with the relevant FAR
> is a material breach of the contract and consequently Fluor is not entitled to sue on the
> parties' contract.
>
> **The court concludes that the NTE applies to Base Scope work and bars Fluor's
> recovery above the NTE amount for Base Scope work.  Because Fluor's
> proposals are FAR-compliant, because Fluor has shown that it performed that
> work, and because the court concludes that Fluor did not materially breach the
> contract first, Fluor is entitled to $2 million on this claim.**

---

[27]  Krafft's testimony refers to this amount, and this amount is consistent with other numbers provided,
although the summary exhibit to which Krafft was referring states that the amount is $20,259,056, not $20,259,065.
This $9 discrepancy appears in related numbers, as well.  Ultimately, the court believes that the higher amount is
most consistent with the documentation in the case.

[28]  This number does not appear on Krafft's summary of damages sought by Fluor in this litigation.  (*See*
Pl.'s Ex. 975).  And Fluor's post-trial brief includes different numbers related to its claim for damages from PCNs.
For example, in several places, it states that it presented twenty-nine PCNs in this litigation totaling $9,653,111
(Post-trial Br. at 33, 105.)  Elsewhere (and in its summary of PCNs), it refers to a figure of $11,930,320 (*id.* at 27),
which is related to the amount sought if the NTE is not enforceable ($13,930,320), but that figure also appears to
include proposal development damages.  (*Compare also id.* at 39 (stating that it is entitled to "$9,665,693, in
damages for change work (PCNs)") *with id* at 40 (proposed findings of fact stating that there are 29 PCNs at issue,
totaling $9,665,684).)
    The court relies on the calculations in Krafft's damages summary (Pl.'s Ex. 975) to determine that
$9,665,684 is the correct figure that Fluor seeks for its PCNs.  Specifically, the court arrived at that figure by
totaling up all of the amounts sought for the listed PCNs, but not including proposal costs or any Base Scope costs
from Plaintiff's Exhibit 975.  The same figure results if you subtract the Base Scope from the total sought
($49,885,132 minus $37,954,821), which equals $11,930,311 for all contested 29 PCNs and proposal development.
If the court subtracts proposal development from that subtotal ($2,264,627), the result is $9,665,684.

2.   PCN Claim

Fluor seeks approximately $9.7 million in PCN costs, which were first submitted as part of its August 2017 proposal.  Fluor asserts that it properly submitted its PCNs, and that they were for compensable work that BAE is contractually required to pay. BAE counters that Fluor is not entitled to any of these amounts because: (1) Fluor did not follow the contract requirements to get paid for change order work; (2) many of the alleged changes were actually part of the Base Scope work, cannot appropriately be considered "changes," and thus are subject to the NTE, and (3) Fluor is barred from recovery of PCNs by first breaching the contract.  Two of the PCNs (PCN 20 and 23, for acceleration costs and schedule variance costs, respectively), the court addresses separately from the other PCNs and in more detail.  Together, those two PCNs represent approximately two-thirds of the PCN costs sought by Fluor.  As to these two PCNs, BAE additionally maintains that Fluor or its subcontractors were responsible for all delays on the project, not BAE, and that Fluor is not entitled to either delay damages or acceleration costs.

**The court concludes that, by entering into Mod 7 and by failing to object on the basis of the contract "changes" clauses, BAE waived its right to object on that ground.  The court further concludes that the parties' course of dealing altered the contract to invalidate those provisions.  The court credits Fluor's experts regarding its entitlement to recovery on the PCNs they are seeking in this litigation, and it will award the full amount Fluor seeks on all of the PCNs.  With regard to PCNs 20 and 23, which the court addresses separately and which were permitted to be submitted by invitation from BAE and were properly and timely submitted, the court finds the testimony of Fluor's expert witness concerning the causes of delay persuasive and more convincing than BAE's contrary expert. The court thus concludes that Fluor has otherwise proved its entitlement to delay damages and acceleration costs.**

3.   Fluor's Proposal Cost Claim

Fluor also seeks approximately $2.3 million in proposal costs.  BAE argues that Fluor is not entitled to its proposal costs because it did not establish that its proposals conformed to the agreed requirements in Mod 7, because some of the costs were incurred in preparation for litigation (which is not compensable) and because there is insufficient evidence supporting the costs (*e.g.*, attorney invoices for any legal fees sought).

**Again, the court concludes that Fluor's proposals were FAR compliant and thus conformed to Mod 7.  But the court agrees with BAE that Fluor has failed to adequately prove that all of its submitted costs were actually proposal costs.  In particular, the court concludes that some of the costs have not been shown to be incurred in preparing a proposal and, indeed, likely were incurred in preparation for litigation.  Thus, the court will award only $1,433,627 to Fluor on this claim, rather than the approximately $2.2 million Fluor seeks.**

4. Fluor's Good-Faith-and-Fair-Dealing ("GFFD") Claim

Fluor argues that BAE breached the Subcontract's implied promise of good faith and fair dealing.  In particular, Fluor argues that BAE has failed to negotiate in good faith to reach a cost agreement, by rejecting Fluor's change proposals, and by concealing material information and then using that information to gain an advantage.  BAE insists that Fluor is simply re-casting its dismissed fraud-in-the-inducement claim and that Fluor cannot establish any damages allegedly resulting from BAE's alleged lack of good faith.

**The court concludes that Fluor has failed to establish that BAE breached its GFFD obligations or, at a minimum, that Fluor suffered any damages as a result.  Thus, it does not award any damages to Fluor for its GFFD Claim.**

**B.  Overview of BAE's Claims and Court's Conclusions as to Same**

BAE's claims and Fluor's basic defenses to each, along with an overview of the court's

ruling on each, are as follows:

1. BAE's Mod 7 Claim for Reimbursement of $6 Million Paid in Base Scope Costs

For this claim, BAE is seeking to recoup $6 million it paid to Fluor in conjunction with Mod 7.  It argues that Fluor has breached the provisions of Mod 7 because it failed to provide a change proposal in accordance with FAR § 15.408, Table 15.2 Section III and/or to provide financial and contract resources to assist BAE in recovering the $6 million from the Army that BAE OSI paid Fluor.  Fluor counters that the $6 million was not contingent on a FAR-compliant proposal, but points to evidence that its proposals complied with FAR § 15.408 regardless.

**The court concludes that BAE has not established that Fluor breached Mod 7 in any respect. As discussed in addressing Fluor's claims, Fluor's proposals complied with FAR, and, in any event, nothing in Mod 7 itself suggests that the $6 million was an advance.  Instead, the testimony supports that it was payment for actual services invoiced and rendered.  Thus, the court concludes that BAE is not entitled to claw back its $6 million payment.  With regard to BAE's argument that Fluor breached the contract by failing to provide financial and contract resources, BAE has not shown by a preponderance of the evidence that it suffered any damages as the result of any such breach.  Thus, the court rejects this claim.**

2. Delay/Defective Work Claim:

BAE seeks $740,610 that it claims it is owed because of Fluor's late completion of its work, which BAE states was unexcused, and also because Fluor allegedly provided

deficient and non-conforming work, resulting in damages to BAE.  Fluor argues that BAE waived the January completion date by entering into Mod 7 after the completion date had passed.  Fluor further contends that most of the delay was attributable to BAE, not to it, and that it did not perform deficient work for any of the tasks referenced in any of the PCNs.  Regardless of the court's rulings on these issues, Fluor also contends that the claim fails because it was made years after the conclusion of the project and only in the context of litigation and because the damages are unsupported and speculative.

**The court finds that BAE did not waive the completion date.  Nonetheless, the court concludes that BAE has failed to prove by a preponderance of the evidence that it suffered delay damages or damages for defective work and to adequately support any such damages at trial.  Thus, the court does not find in BAE's favor on this claim.**

## C.  Elements of Breach-of-Contract Claim

To assert a claim for breach of contract, the plaintiff "must establish three elements: '(1) a legally enforceable obligation of the defendant to the plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation.'"  *SNC-Lavalin Am., Inc. v. Alliant Techsys., Inc*., 858 F. Supp. 2d 620, 632 (W.D. Va. 2012) (quoting *Sunrise Continuing Care, LLC v. Wright*, 671 S.E.2d 132, 135 (Va. 2009)).

Moreover, in Virginia, "the party who commits the first material breach of a contract is not entitled to sue to enforce its terms."  *See W.C. Eng., Inc. v. Rummel, Klepper & Kahl*, No. 6:17-cv-00018, 2021 WL 4782274, at *5 (W.D. Va. Oct. 13, 2021); *see also Countryside Orthopaedics, P.C. v. Peyton*, 541 S.E.2d 279, 287 (Va. 2001) ("[T]he first party to commit a material breach can neither enforce the contract nor maintain an action on it.") (citing *Hurley v. Bennett*, 176 S.E. 171, 175 (Va. 1934)).  Under Virginia law, "[a] material breach is a failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract.  If the initial breach is material, the other party to the contract is excused from performing his contractual obligations."  *See Remy Holdings Int'l v. Fisher Auto Parts, Inc*., No. 5:19-cv-00021, 2022 WL 571527, at *2 (W.D. Va. Feb. 25, 2022)

30

(citing *Horton v. Horton*, 487 S.E.2d 200, 204 (Va. 1997)).  "While this doctrine may sometimes

result in seemingly harsh results, especially when parties continue to perform under the contract,

Virginia law is clear in its application of the doctrine."  *Remy Holdings Int'l*, 2022 WL 571527,

at *2.

### D.  Fluor's Breach-of-Contract Claims

In its post-trial briefing, Fluor alleged a number of breaches of the express terms of the

contract.  In general terms, it claims that BAE materially breached the Subcontract by, among

other actions, failing and refusing to pay Fluor all amounts owed under the Subcontract for Base

Scope work and for changes, delays, and acceleration costs caused and directed by BAE on the

Project, along with the overhead and profit to which Fluor is entitled.  Fluor identifies five

different aspects of the Subcontract BAE allegedly violated.  They all fall within one or more of

the claims as grouped by the court above.  (*See generally* Fluor Redacted Post-trial Br. ("Fluor

Br.") 88–95, Dkt. No. 229.)

The express provisions that Fluor alleges were breached are:

1. **General Provisions, Section 1A(3), Contract Directions and Changes, and 52.243-3 Changes, Section 19 Disputes** – Fluor argues that BAE breached these provisions by:

   a. failing to issue an equitable adjustment to the Subcontract based upon changes caused by BAE;

   b. failing to pay Fluor all amounts owed under the terms of the Subcontract for Base Scope work and for changes, delays, and acceleration costs caused and directed by BAE on the Project, along with the overhead and profit to which Fluor is entitled;

   c. failing to negotiate  Fluor's  PCNs in "good  faith," which included BAE's refusal to recognize and acknowledge directed changes on the Project.  In particular, Fluor argues that BAE employees directed Fluor and its subcontractors to perform work that was not required in the Base Scope

of work, but then refused to acknowledge that the work was a change to the Subcontract and refused to accept Fluor's cost proposal for that work.[29]

2. **General Provisions, Section 7 and Supplemental Terms and Conditions Section 2.15(e), Payment** – The same failures to pay referenced in Claim 1, *supra*, also breached these provisions of the Subcontract.[30]

3. **General Provisions, Section 8, Taxes –** Fluor claims that BAE breached the Subcontract by issuing an invalid Virginia (VA) Form ST-11 Manufacturing Exemption Certificate (ST-11) and did not provide the contractually required certificate until nearly ten (10) months into the Project, causing Fluor's subcontractors to incur unanticipated sales tax, which Fluor had to reimburse and which cannot be feasibly or practicably recovered by Fluor or its subcontractors.[31]

4. **General Provisions, Section 41, Cessation of Work –** Fluor alleges that BAE materially breached the express terms of the Subcontract when it failed to negotiate a definitive Agreement in good faith in material breach of Mod 4, forcing Fluor to suspend work, and then failing to compensate Fluor for the additional performance costs and delays resulting from this breach of the Subcontract.  (*See* J. Ex. 1.)[32]

5. **Modifications Nos. 4 and 7 –** Fluor alleges that BAE materially breached Modification Nos. 4 and 7 by failing and refusing to negotiate with Fluor in good faith to address definitization of the UCO.  BAE also failed and refused to negotiate in good faith Fluor's change proposals, PCNs, and the updated costs included in the October 20, 2016 change proposal.[33]

**1. Fluor's Base Scope Claim**

In the Base Scope Claim, Fluor seeks costs it expended to complete the Base Scope work, which it claims amounts to $8,341,318 in invoiced amounts unpaid by BAE.  (Fluor Br. ¶ 193.) This includes $2 million that BAE failed to pay up to the NTE amount of the contract.  As previously noted, the NTE for SLIN00 was $19,720,652 (in addition to the $11,905,424 negotiated for the design and start of construction costs).  The parties agree that BAE has already

---

[29] These alleged failures underpin a portion of all four of the claims as characterized by the court previously: the Base Scope Claim, the PCN Claim, the Proposal Claim, and the GFFD Claim.

[30] These alleged failures generally relate to the Base Scope Claim.

[31] This claim is a part of what the court refers to as Fluor's PCN Claim, as it is specifically part of PCN 17.

[32] This claim is a part of both Fluor's PCN claim and the GFFD claim.

[33] Again, this claim relates to all of Fluor's claims as characterized by the court.

paid Fluor $17,720,652 of that (*i.e.*, all but $2 million).  BAE contends that if Fluor can recover

any Base Scope costs, it can only recover a maximum of $2 million because Fluor's damages are

capped by the NTE.

> a. *The NTE in Mod 7 is applicable, and Fluor cannot use the "first material breach" doctrine to avoid the NTE limitation on its affirmative claims.*

The court previously ruled on the viability of the NTE in Mod 7, and it concluded that it

applies to limit Fluor's damages for Base Scope work.  (*See* Mem. Op., Dkt. No. 201.)

Specifically, on the issue of the NTE, the court summarized its ruling as follows:

> [T]he court finds that the UCO, as revised by Mod 7 to the
> Subcontract, imposes a not-to-exceed amount of $19,720,652 for
> BAE's liability for work completed by Fluor pursuant to the UCO.
> Thus, if the NTE provisions of the UCO apply to the parties'
> agreement, Fluor cannot recover in excess of the above amount for
> work pursuant to the UCO."

(Mem. Op. 12, Dkt. No. 201.)  The court left open the possibility that a first material breach by

BAE might limit BAE's ability to enforce the NTE.  *See id.*

The parties now ask the court to resolve the questions the court left open: whether BAE

breached the Subcontract—both first and materially—and if so, whether BAE is still entitled to

enforce the NTE provision against Fluor.  Fluor contends that it is entitled to amounts above the

NTE because BAE's first material breach effectively voided the NTE provision.  BAE disagrees,

arguing that Fluor's recovery, if any, is limited to the $2 million of Base Scope costs that fall

below the NTE amount and have not been paid by BAE.

Because the doctrine of "first material breach" is not available to Fluor in pursuing its

own breach of contract claims, Fluor's attempts to avoid the NTE restriction through its

contention that BAE was the first party to materially breach the contract are misguided.  In

particular, Fluor misapprehends the doctrine of "first material breach" under Virginia law.

In Virginia, "the party who commits the first material breach of a contract is not entitled *to sue* to enforce its terms." *See W.C. Eng., Inc. v. Rummel, Klepper & Kahl*, No. 6:17-cv-00018, 2021 WL 4782274, at \*5 (W.D. Va. Oct. 13, 2021) (emphasis added).  The "first breach doctrine is an affirmative *defense*." *Denton v. Browntown Valley Assocs., Inc*., 803 S.E.2d 490, 497 (Va. 2017) (emphasis added).  Fluor, however, is trying to use the material breach doctrine offensively, which it cannot do.

The district court in *Vivos Acquisitions, LLC v. Health Care Res. Network, LLC*, No. 1:19-cv-1606, 2022 WL 995389, at \*5 (E.D. Va. Mar. 31, 2022), explained the operation of the doctrine well:

> Although Plaintiff also argues that the doctrine of first material breach applies to its affirmative breach of contract claim against Defendants, that position misreads the law. Under this theory, Plaintiff would be excused from its contractual obligations because Defendants . . . would have already breached the contract themselves.  *See Countryside Orthopaedics, P.C. v. Peyton*, [541 S.E.2d 279, 285 (Va. 2001)] ("[W]hen the first breaching party commits a material breach, that party cannot enforce the contract."). But this is an affirmative defense, not an element of a contract breach claim. As this Court has noted, "the first material breach doctrine operates not as remedy requested by a party in its capacity as a plaintiff, but as an affirmative defense pled by a party in its capacity as a defendant." *SunTrust Mortg., Inc. v. United Guar. Residential Ins. Co.*, 806 F. Supp. 2d 872, 887 (E.D. Va. 2011). Therefore, as a matter of law this doctrine is not available to Plaintiff in proving its case . . . .

*Id.* at \*5.[34]

---

[34] Although the *SunTrust Mortgage* case to which the *Vivos Acquisitions* court cites was subsequently vacated in part on appeal, *see Suntrust Mortg., Inc. v. United Guar. Residential Ins. Co.*, 508 F. App'x 243, 2013 WL 388040 (4th Cir. 2013), the Fourth Circuit did not take issue with the cited analysis.  Further, the district court on remand interpreted the mandate as permitting it to decide whether one of the breaches of contract, standing alone, constituted a first material breach, and so addressed that issue anew.  *See Suntrust Mortg., Inc. v. United Guar. Residential Ins. Corp.*, No. 3:09cv529, 2014 WL 998188, at \*8 (E.D. Va. Mar. 13, 2014).  Moreover, the same language quoted by *Vivos Acquisitions* was subsequently echoed by the Supreme Court of Virginia, albeit in a concurring opinion.  *See Mathews v. PHH Mortg. Corp.*, 724 S.E.2d 196, 208 (Va. 2012) (McClanahan, J., concurring).

Thus, while the court addresses—in the context of Fluor's claims against BAE—whether BAE breached the contract so as to allow Fluor to recover damages, Fluor cannot avoid contractual terms that it does not like simply by claiming that BAE materially breached first. *See id.* And, for the reasons explained in its prior summary judgment opinion, the court finds that the NTE is an enforceable term of the contract that limits Fluor's recovery on the entirety of the construction Base Scope work (consisting of SLINs 2 and 3). That amount is $11,905,424 (the firm-fixed price for SLIN 2) plus $19,720,652 (the NTE price from Mod 7, totaling $31,626,076. Of this amount, BAE has paid Fluor $29,626,076 for its Base Scope construction work on the Facility. Of that payment, $1,852,724 was for design and $27,773,352 was for construction. (J. Stip. ¶ 48.) Thus, BAE has paid all but $2 million of the total NTE amount.

> ### b. BAE breached the Subcontract by not paying Fluor up to the NTE for Base Scope work.

The evidence at trial showed that Fluor performed the Base Scope work, that its costs exceeded the NTE amount, and that its costs were reasonable and supported by appropriate documentation. (*See generally* Tr. 4 at 50–51 (testimony of expert Fecke of Exponent); *id.* at 143–45 (testimony of expert Travis at Exponent); Pl.'s Ex. 972.) The court credits the testimony of Fecke and Travis on these points. Thus, the court concludes that BAE breached the Subcontract by not paying up to the NTE amount, and that Fluor was damaged thereby, in the amount of $2 million.

BAE, however, offers two separate arguments as to why Fluor cannot obtain that $2 million. First, BAE contends that Fluor's proposals failed to comply with FAR § 15.408 Table 15-2, as Mod 7 to the Subcontract required. BAE appears to contend that this is a breach and that it is a material one, precluding any claims by Fluor based on subsequent alleged breaches by BAE. Second, BAE contends that Fluor first materially breached the contract by failing to

provide personnel and resources as contemplated in Mod 7.   The court disagrees with both contentions.[35]

*i.  Fluor's proposals complied with FAR § 15.408 Table 15-2.*

BAE first contends that Fluor failed to submit proposals that complied with FAR § 15.408 Table 15-2, Instruction III.B and that the failure constituted a first material breach of the Subcontract, precluding Fluor from suing on it.  Section III is titled "Formats for Submission of Line Item Summaries."  Subsection B is titled  "Change Orders, Modifications, and Claims"; it provides different columns that should be in a claim for payment.  There are seven columns listed, and the instructions provide additional details as to how to complete each column.  The seven columns listed are as follows:

| Cost elements (1) | Estimated cost of all work deleted (2) | Cost of deleted work already performed (3) | Net cost to be deleted (4) | Cost of work added (5) | Net cost of change (6) | Reference (7) |
|---|---|---|---|---|---|---|

FAR § 15.408 Table 15-2, Instruction III.B.  The instructions then explain how to complete each column.[36]

_____

[35]  BAE also has asserted that Fluor breached the contract by providing certain defective work and as the result of delays.  It does not argue that these breaches were material, and the court addresses those claims separately.

[36]  The instructions themselves, referring to each column by number, state:

(1) Enter appropriate cost elements.

(2) Include the current estimates of what the cost would have been to complete the deleted work not yet performed (not the original proposal estimates), and the cost of deleted work already performed.

(3) Include the incurred cost of deleted work already performed, using actuals incurred if possible, or, if actuals are not available, estimates from your accounting records. Attach a detailed inventory of work, materials, parts, components, and hardware already purchased, manufactured, or performed and deleted by the change, indicating the cost and proposed disposition of each line

BAE argues that Fluor's 2017 and 2019 proposals did not comply with those requirements.  BAE states that Fluor failed to show:

- the current estimates of costs required by the Original SOW (Instruction 2);

- the cost of work that was deleted by the change—SOW Addendum Rev. 4 (Instruction 3);

- the estimate of cost or work added by SOW Addendum Rev. 4 (Instruction 5); and

- "most glaringly," according to BAE, the net cost of the change (Instruction 6).

(BAE Br. 26–27.)

The primary defect with the proposals, according to BAE's expert, Mark LoManto, was that they were total cost proposals for the combined Original SOW and SOW Addendum Rev. 4, but did not segregate Base Scope costs between the original SOW (for the design and construction of a temporary facility), and the additional work resulting from SOW Addendum Rev. 4, or the work purportedly deleted by SOW Addendum Rev. 4, or the net cost of the

---

item. Also, if you desire to retain these items or any portion of them, indicate the amount offered for them.

(4) Enter the net cost to be deleted, which is the estimated cost of all deleted work less the cost of deleted work already performed. Column (2) minus Column (3) equals Column (4).

(5) Enter your estimate for cost of work added by the change. When nonrecurring costs are significant, or when specifically requested to do so by the Contracting Officer, provide a full identification and explanation of them. When any of the costs in this column have already been incurred, describe them on an attached supporting schedule.

(6) Enter the net cost of change, which is the cost of work added, less the net cost to be deleted. Column (5) minus Column (4) equals Column (6). When this result is negative, place the amount in parentheses.

(7) Identify the attachment in which the information supporting the specific cost element may be found. (Attach separate pages as necessary.)

FAR § 15.408 Table 15-2, Instruction III.B.

changes in SOW Addendum Rev. 4, all of which he stated are required by FAR § 15.408, Table 15-2, Section III.B.  Instead, Fluor simply provided the costs for the total Base Scope work, combining the Original SOW and SOW Addendum Rev. 4.

LoManto testified that, "there was no attempt either on a total cost to total cost or task to task attempt to measure anything in regard to the temporary facility cost."  (Tr. 9 at 45:11–16; *id.* at 48:24–11 ("[The proposals] did not [comply with FAR § 15.408, Table 15-2, Section III.B], and what drives that for the most part is the proposals offered insufficient contextual information with regard to measuring the technical difference between the temporary and the permanent facility.  And then we also believe that the proposed base costs and profit failed to meet the test of price reasonableness because of that missing contextual information.").)

In other words, the "net change" between costs from the "original scope of work" and costs caused by the change to the permanent construction is the key information.  Without it, BAE's argument continues, BAE could not conclude how much of Fluor's costs fell within SOW Addendum Rev. 4, as opposed to how much of the cost was just cost growth.  BAE contends that Fluor's failure to allocate costs between the two "allowed [it] to hide errors associated with bid misses, mismanagement, and the full costs of its design subcontractors' numerous and expensive errors in the combined Base Scope costs," which limited BAE in its negotiations with the Army. (BAE Br. 26–28.)

On the issue of FAR compliance, the court found more convincing the testimony of Fluor's expert, Krafft.  Krafft testified that there are different ways of complying with FAR § 15.408.  The proper method varies by the context and specific situation of the project at issue. As Krafft testified, supported by documents used generally in the field of government contracting and accounting, there are several different methods or ways to present a proposal that

complies with FAR § 15.408.  In a situation where a contractor has performed no work on the item, the item is totally deleted from the contract for purposes of the FAR, even if it is not written as a "deletion" in the contract.  He explained:

> Now, whether the contract was written that way or not . . . because we know that the permanent was written as an add to the temporary, but when you come around to building it, it's not like putting on a different roof.  It's a different building in a different place.
>
> In accounting, it's fundamentally accounting for transactions, and you can only account for what was built, not what might have been built.  So in this case the cost of the work not performed, the only feasible way to handle that is as a total deletion when you're doing the accounting for the contract costs.

(Tr. 5 at 59.)[37]

BAE insists, though, that the original SOW always remained a requirement of the Subcontract and the construction work was funded under SLIN 002, while SLIN 003 funded work resulting from SOW Addendum Rev. 4, which was only the additional work required to convert the project into a permanent facility.  Because SLIN 002 was never deleted or removed and because Fluor invoiced against that SLIN separately (at the beginning) from SLIN 003, the original SOW was not a severable item nor was it deleted, according to BAE.  (BAE Br. 34.)

BAE is correct that the original SOW was not deleted from the contract.  But the facts make clear that BAE did not ever want, nor ever require, Fluor to design or build the temporary facility at the temporary location.  Indeed, from the day after the Subcontract was signed when BAE advised Fluor of the change, there was never any expectation by either party that the temporary facility would be designed or built.

---

[37]  Krafft also credibly testified that he had never, in his decades-long career, seen a contractor's claim denied because the costs were not in the format of the specific table laid out in the instructions.  (Tr. 5 at 61.)

Put differently, BAE's insistence that there remained an "Original SOW," the costs of which should be allocated separately from the costs of the "change" to permanent, completely ignores the reality of what occurred on this project and how the parties treated it. Essentially, the parties structured the Subcontract as a change from the original statement of work so that BAE would not have to solicit bids on the construction portion of the project again and fall even further behind the already-delayed schedule. Additionally, all of the work billed to SLIN 0002 was work for the permanent facility. The "original" construction scope of work was effectively just a funding mechanism for the work eventually agreed to in Attachment Rev. 4. So, despite the way the contract was structured, it remains clear that there was no work done—or asked to be done—on a temporary facility.[38]

This fact plays a significant role in the court's conclusion that Fluor's proposals complied with FAR. As Krafft explained, the building that was constructed was being paid for by both the SOW and the SOW Rev. 4: both were "paying for the building, but only one building was built. It wasn't a temporary that was converted to a permanent by some strengthening. It was a different building in a different place." (*Id.* at 60.)

The court's conclusion is further supported by the fact, also noted by Krafft, that the later proposals followed the same format and structure that the October 2016 proposal had followed. BAE stated that it was able to analyze the costs in the October 2016, but now asserts that it was unable to analyze the costs in the August 2017 and August 2019 proposals. In all three, though, Fluor deleted the cost of the temporary facility in its entirety. Krafft described this as "completely proper" to show it as completely deleted and also that Fluor's proposals complied

---

[38] Interestingly, although BAE and Fluor did not structure their Subcontract as "deleting" the temporary facility, the Army deleted the temporary facility design "in its entirety" from BAE's contract and replaced it with a permanent design. (J. Ex. 3.) So, the Army understood that BAE was not including any work on a temporary facility in its requests for payment.

with FAR § 15.408.  He stated that the "point of the 15.408 is to show the net money remaining

after the deletion of the deleted work.  And in this case in October of '16 and also in August of '

'17 and August of '19 it was still fully deleted.  The temporary building was never started.  And

so it was completely proper to show it as completely deleted."  (Tr. 5 at 63.)  Moreover, BAE

represented to the government that the October 2016 change proposal complied with FAR in all

respects.  (Tr. 6 at 118.)

In sum, the big picture of the parties' contract is that BAE structured the Subcontract as

the design and construction of a temporary facility, and then treated as a "change" the conversion

to a permanent facility at a different site.  As repeatedly noted, however, neither party ever had

any intention of actually designing or building the temporary facility.  Thus, even though the

original scope of work was not technically "deleted," and the "conversion" to permanent

increased the cost, the costs under the "original scope of work" were always intended to be part

of the permanent facility's construction.  The temporary one was, in effect and as the parties

clearly agreed, deleted.  Thus, it was appropriate in this circumstance, to not separately allocate

funds between the never-designed, non-existent building and the actual facility Fluor designed

and constructed.  For all of these reasons, the court finds that Fluor submitted FAR-compliant

proposals and thus did not breach the contract in this respect.

> ii. *Fluor's claim is not barred under the first material breach doctrine as*
> *a result of its alleged failure to provide help and resources.*

BAE also contends that Fluor materially breached the contract first by failing to provide

the help and resources, as referenced in Mod 7, so that BAE could obtain payment from the

government.  The court disagrees that BAE has proven a breach by Fluor of this provision.

BAE raised the issue at trial.  (*See, e.g.*, Tr. 5 at 212 (testimony of BAE's Bate that she

does not recall Fluor providing financial or contracts personnel to help BAE convince the Army

of the validity of Fluor's costs as allocable to SOW Addendum Rev. 4).)  But this particular

provision was not a point of emphasis by either party.  Indeed, it receives little attention in

BAE's Post-trial Brief (BAE Br. 6, 32–33), and none in Fluor's.  Regardless, BAE is correct that

there is no evidence Fluor provided help or resources.  *Critically*, though, BAE also points to no

evidence that it asked for such assistance, or that it sought such assistance in connection with

submission of any request made to the Army.  (*Cf.* Tr. 5 at 212 (K. Bate testimony that she did

not recall Fluor providing any "such assistance").)

      To be sure, BAE asked for Fluor to resubmit its proposal and to structure it differently—a

request that was unnecessary in light of the court's finding that the proposal complied with the

relevant FAR.  And even today, BAE has not identified what that resources or help would have

looked like, other than a change in the proposal itself, which the court already has concluded was

in a proper format.  Thus, the court finds no breach of that provision.

      Furthermore, even if Fluor breached this provision, BAE has not identified what its

damages are from such a breach.  Mod 7 requires payment from BAE regardless of whether BAE

is paid by the Army.

      Lastly, and again, even if Fluor breached, the court concludes that the breach was not

"material," because Fluor's "failure to perform that obligation [did not] defeat[] an essential

purpose of the contract."  *Horton v. Horton*, 487 S.E.2d 200, 204 (Va. 1997) (citations omitted).

      For all these reasons, the court does not find that BAE has shown a breach or a material

breach of the portion of mod 7 requiring Fluor to provide "help and resources" to BAE in

seeking funds from the Army.  Because there was no first material breach by Fluor, it may

recover $2 million on its Base Scope Claim.

### 2. Fluor's PCN Claim

Fluor also seeks damages against BAE based on its failure to pay for PCNs submitted by Fluor as part of its August 2017 and 2019 Proposals.  There are 29 PCNs that Fluor says BAE has not paid, in addition to costs for proposal development.[39]  BAE divided Fluor's PCN Claim into two subsections, and the court does so, as well.  The first relates to PCNs 6–12, 14, 16–19, 21, 24, 33, 34, 36–42, and 45–48.  The second relates to claims PCN 20 and 23, which concern delays and acceleration costs and which comprise more than two-thirds of the total amount of PCNs sought.

#### a.  PCNs (with exception of PCNs 20 and 23)

BAE contends that Fluor is not entitled to payment for the "vast majority" of the PCNs for two independent reasons.  First, it argues that Fluor did not comply with the Subcontract's "Changes Clause," and so Fluor is not entitled to payment on these PCNs.  Second, it contends that Fluor failed to prove entitlement to its PCNs.  As to this second argument, BAE addresses each of the PCNs separately and explains why each is either not an appropriate PCN (typically because it was already within the Base Scope of work, because BAE did not authorize it, or because the change was made necessary by Fluor or its actions, rather than by BAE).

The Subcontract contains several requirements that Fluor must satisfy to obtain payment for work outside the Base Scope.  Specifically, in order for Fluor to receive payment for any PCN, the Subcontract required the following to have occurred:

> (a) Fluor submitted contractual notice to a BAE Procurement Representative for any actual or constructive change prior to performing the work (J. Ex. 1, Subcontract § 3(c)- (d));
>
> (b) A BAE Procurement Representative authorized Fluor, in writing, to proceed with the alleged changed work prior to commencement of the work (*id.* at § 3(f));

---

[39]  As noted supra at note 26, the 29 PCNs are PCN 6-12, 14, 16-21, 23-24, 33-34, 36-42, and 45-48.

(c) After receiving written authorization from a BAE Procurement Representative, Fluor submitted a request for adjustment to BAE Procurement Representative "no later than thirty (30) days after the date" of the written authorization (*id.* § 3(a)); and

(d) The alleged changed work fell outside of Fluor's Base Scope (*see* J. Ex. 1, Original SOW, Mod 3, SOW Addendum Rev. 4, Mod 7).

(BAE Br. 57.)

Additionally, and because the Subcontract incorporates by reference FAR § 52.243-4, BAE also contends that the following FAR requirements must be met for Fluor to recover for any of its PCNs:

(a) BAE provided written or oral direction that caused Fluor to perform work outside of Base Scope (see FAR § 52.243(b));

(b) Fluor provided written notice stating (a) the date, circumstances, and source of the order and (b) that the Contractor regards the order as a change order (*see id.*); and

(c) Fluor's written notice of the above was given within 20 days from when Fluor incurred the costs associated with the alleged change (*see* FAR § 52.243(d)).

Furthermore, after providing the written notice required by FAR § 52.243(b), Fluor must assert its right to an adjustment with the amount of its proposal within 20 days after providing the written notice.  *See* FAR § 52.243(e).

BAE contends that Fluor knew about these requirements, which it collectively refers to as the "Changes Clauses," and that it followed them in submitting some PCNs but did not *fully* comply with the Changes Clauses for any of the disputed PCNs for which it is seeking payment in this suit.[40]

Fluor does not dispute that it did not comply with all of the change requirements or incorporated regulations for all of the PCNs except PCN 20 and 23.  Fluor asserts several other

---

[40] BAE admits that "Fluor has arguably met the notice requirement for PCNs [6, 8, 9, 33, 36, and 39]," but contends that Fluor "did not satisfy the authorization and/or timing requirements of the Changes Clauses for these PCNs."  (BAE Br. 60 n.32.)

arguments, though, to support its contention that BAE still was obligated to pay for those PCNs. First, Fluor contends that BAE waived its right to object on timeliness grounds in specifically agreeing, in Mod 7, to allow for the subsequent submission of change proposals.  For support, Fluor notes that the Subcontract Mod 7 required Fluor to "promptly" submit a change proposal to BAE for Base Scope costs in accordance with FAR § 15.408, Table 15-2 Section III.  Mod 7 also "reserve[d] and acknowledge[d] Fluor's right to submit a change proposal for costs incurred for work performed outside the scope of Revision 4 of the SOW."  Because Mod 7 allowed Fluor to submit a change proposal for non-Base Scope work, Fluor's argument continues, BAE exercised the option permitted it under the Subcontract to accept and review a change proposal submitted by Fluor at any time prior to Final Payment.  (Subcontract § 3(h), J. Ex. 1.)

Fluor also claims that BAE waived "any timing requirements" by reviewing Fluor's change proposals without objecting on timeliness grounds, including PCN 20 (Acceleration) and PCN 23 (Schedule Variance), and Fluor's August 2017 and 2019 change proposals.  (Fluor Br. 21–22.)

> i.  *BAE waived its right to object to Fluor's failure to comply with the Changes Clauses, and the parties' course of dealing treated those clauses as omitted from the Subcontract.*

The court agrees with Fluor that BAE's arguments concerning proper notice and timely requests have been waived by BAE's conduct.  In Virginia, a party must knowingly and intentionally waive any contract rights.  *See May v. Martin*, 137 S.E.2d 860, 865 (Va. 1964) ("Waiver is the intentional relinquishment of a known right, with both foreknowledge of its existence and an intention to relinquish it.").  Furthermore, Virginia law requires that the party claiming waiver has the burden of establishing it "by clear and unmistakable proof."  *Id.* at 865; *see also Serv. Steel Erectors Co. v. SCE, Inc.*, 573 F. Supp. 177, 179 (W.D. Va. 1983) (citing

*May* for that proposition and declining to find waiver on facts before it); *Heinrich Schepers GmbH & Co, KG v. Whitaker*, 702 S.E. 2d 573, 577 (Va. 2010) (explaining that a person will be found to have waived a right only if "plainly appear[s]" that "he knows his rights, and intends to waive them").

The court finds it significant that BAE entered into Mod 7 in March 2017, after nearly all of the work on the project had been completed.  Mod 7 required Fluor to "promptly" submit a change proposal to BAE for Base Scope costs, and the parties also reserved and acknowledged Fluor's right to submit a change proposal for costs incurred for work performed outside the Base Scope work.  Given that most of the work had been completed and the contractual deadlines for submitting "changes" for many of the changes on the Project had passed, Mod 7's provision allowing Fluor to file both a cost proposal for Base Scope costs and a change proposal constituted a waiver of BAE's right to insist on compliance with those already-passed deadlines. Fluor's "right" to submit a change proposal would be nearly meaningless otherwise.

Furthermore, BAE accepted and reviewed both change proposals submitted by Fluor. Although it did not agree with either proposal, it did not raise any timeliness concerns, state that it lacked notice of the changes, or contend that Fluor failed to obtain the proper approvals from the contracting representatives.  Thus, the court concludes that BAE has waived those arguments.

The court's conclusion dovetails with, and is further supported by, Virginia law on modifications to a contract by the parties' course of dealing.  Virginia law permits the parties to a written contract to modify or amend its provisions either orally or by a course of conduct, even when the contract specifies that it can only be amended by a written document signed by both parties. *See Reid v. Boyle,* 527 S.E.2d 137, 144–45 (Va. 2000); *Stanley's Cafeteria, Inc. v. Abramson*, 306 S.E.2d 870, 873 (Va. 1983) (recognizing that Virginia law allows parties to

modify contractual provisions through their course of dealing).  Course of dealing is considered in light of all the circumstances and requires evidence of "mutual intent to modify the terms of [the parties'] contract." *Cardinal Dev. Co. v. Stanley Constr. Co.*, 497 S.E.2d 847, 851 (Va. 1998) (quoting *Stanley's Cafeteria*, 306 S.E.2d at 873); *see also Medlin & Son Constr. Co. v. Matthews Grp., Inc.*, No. 160050, 2016 WL 7031843, at *5 (Va. 2016).  And in most cases, parties may altogether "waive, dissolve, or abandon [the contract], or add to, change, or modify it, or vary or qualify its terms, and thus make it a new one . . . ." *Warren v. Goodrich*, 112 S.E. 687, 694 (Va. 1922), even if there are terms in a contract which purport to limit the parties' abilities to do so.  To find that the parties have modified the terms of their contract by mutual agreement, there must be "clear, unequivocal and convincing evidence" of the parties' intent to modify the contract.  *Stanley's Cafeteria, Inc.*, 306 S.E.2d at 873.

Ultimately, the issue of whether a contract was modified is a question of fact suitable for the factfinder.  *See Va. Elec. & Power Co. v. Norfolk S. Ry. Co.*, 683 S.E.2d 517, 528 (Va. 2009); *see also Strata Solar, LLC v. Fall Line Constr., LLC*, No. 4:22CV106, 2023 WL 9319112, at *1 (E.D. Va. Nov. 13, 2023) (explaining, in addressing judgment as a matter of law, that a factfinder could find that a course of dealing had modified the terms of the parties' contract).  Having sat as factfinder, the court finds clear and convincing evidence that, despite the way the contract was structured, the parties' course of dealing clearly changed the contract with regard to the Changes Clauses and the incorporated FAR.

In particular, the parties often changed the work on the project without going through the formal process of written notice set forth in the Changes Clauses.  For example, BAE's technical representatives regularly directed Fluor to perform changed and extra work throughout the project.  (Tr. 2 at 21–26, 28–29.)  As noted in the court's findings of fact, neither BAE nor Fluor

typically ran those changes by the contracting representatives.  Indeed, sometimes changes were communicated directly to Fluor's subcontractors.  Again, this is one of the ways in which the parties effectively ignored the language of the contract.  BAE has decided as part of its litigation strategy to challenge the PCNs on this basis, but the parties, with limited exceptions, did not follow the contractual provisions during the course of the project.  Thus, the court finds that the parties' course of conduct shows it was not necessary to follow them.  *See, e.g.*, *Carnell Const. Corp. v. Danville Redevelopment & Hous. Auth.*, No. 4:10CV00007, 2011 WL 285694, at \*3–5 (W.D. Va. Jan. 27, 2011) ("[A] course of dealing by contracting parties, considered in light of all the circumstances, may evince mutual intent to modify the terms of [a] contract . . . .); *Ross Eng'g Co. v. Pace,* 153 F.2d 35, 49 (4th Cir. 1946) (finding that change order procedures were waived where "[f]rom the beginning of the contract work the parties to the subcontract ignored the provisions as to written orders and proceeded with the work with little or no regard for them").)

*     *     *

For all these reasons, Fluor's failure to follow the Changes Clauses does not affect its ability to recover payment for its PCNs.

### ii.    Fluor is entitled to payment for its PCNs.

Much of the testimony at trial was devoted to specific aspects of the Project and whether a particular task (many of them contained in the PCNs) was part of the Base Scope work and whether it was performed properly.  BAE also has provided its explanation as to each of the unpaid PCNs as to why Fluor is not entitled to recover the specific costs, even if it had otherwise

complied with the Changes Clauses.  For its part, Fluor relies on the opinions of two if its experts—Fecke and Travis—both from a firm called Exponent.[41]

The court has considered the extensive evidence presented by both fact witnesses and expert witnesses at trial.  It also has considered the arguments made in the parties' post-trial briefs as to the PCNs.  Although there is disputed evidence as to some of the PCNs, the court finds that Fluor has shown, by a preponderance of the evidence, that it is entitled to payment for the PCNs in the amount it seeks.  In particular, the court finds that the report and testimony of Fecke and Travis was thorough, balanced, and based on documentation and other evidence such that it is credible.  Their testimony fully supports both that the costs now sought were outside of the Base Scope and that they were costs reasonably incurred by Fluor, for work that was sound, and supported with appropriate documentation as submitted to BAE.  At bottom, the court does not believe that any of the other testimony seriously called into question their opinions and conclusions, which the court credits.  In particular, the court discounts testimony from BAE and its arguments that essentially nothing was outside of the Base Scope.  Those arguments are unsupported by the evidence and what actually occurred on the project.

In short, and as to all of the PCNs except PCN 020 and 023, the court adopts the findings and opinions of experts Fecke and Travis.  Thus, the court will award Fluor the full damages it seeks on those PCNs.

---

[41] BAE contends that the court should not rely on these expert opinions, in part, because they were based on after-the-fact summaries of what occurred, written by a Fluor employee who was hired after the project was complete.  Those issues go to credibility, and the court specifically finds that these two experts were credible and had done substantial work and analysis of the PCNs in determining whether they were outside of Base Scope Work and whether the work was properly performed and the costs appropriately supported.

### b.  PCN 20 and 23 (delay and acceleration costs)

Of the $9.6 million sought for the PCNs, two PCNs comprise over $6 million of that amount: PCN 20 for schedule acceleration ($3,796,375) and PCN 23 for delays based on schedule variance analysis ($2,747,218).  The court will discuss them in more detail.

In PCN2 20, Fluor seeks to recover its acceleration costs, which it claims were incurred to abide BAE's repeated directives to do "whatever it takes" to meet the January 13, 2017 deadline.  Relatedly, in PCN 23, Fluor seeks to recover damages resulting from delays to the project, to the extent that those delays are attributable to BAE, and not Fluor.

The parties agree that if the delay was "excused," *i.e.*, caused by BAE, then Fluor is entitled to a schedule extension, delay damages, and potentially acceleration costs.  (BAE Br. 82.)[42]  In order for Fluor to recover acceleration costs, Virginia law requires Fluor to prove that (1) the completion date should have been adjusted to a later date to "adjust" for delays outside of Fluor's control, *i.e.*, excusable delay; (2) that BAE ordered Fluor to accelerate, and (3) that Fluor in fact accelerated performance and incurred extra costs.  *See McDevitt & Street Co. v. Marriott Corp.*, 713 F. Supp. 906, 909 (E.D. Va. 1989), *rev'd in part on other grounds*, 911 F.2d 723 (4th Cir. 1990).  In contrast, if the delay was unexcused, *i.e.*, caused by Fluor or its subcontractors, then BAE is entitled to delay damages.

At trial, the parties offered competing experts as to the cause of the project delays.  Fluor's expert, Russell Wodiska, opined that BAE was responsible for 213 of the 262 days of delays, and he calculated damages based on that opinion.  Wodiska and Fluor acknowledged that

---

[42]  BAE contends that even accepting the testimony of Fluor's expert, Fluor still may not recover delay costs for most of the delays because it failed to follow the contract requirements for submitting a delay claim, which required it to give written notice to BAE within five working days of when it anticipates a delay, stating the reasons and explaining what it will do to minimize the impact of the delay.  (BAE's Br. at 88–89 (citing J. Ex. 1, Subcontract § 28(f).)  It argues that this provides an independent reason for denying Fluor any delay damages.  The court rejects this argument.  The delays were well-known to both BAE and Fluor, particularly given BAE's insistence that Fluor do whatever it takes to complete the Project as soon as possible.

there were both delays and increased costs attributable to Fluor's design firm, Zapata.  Fluor presented evidence that it had not sought approximately $4 million in costs that it or its experts attributed to Zapata.

BAE's expert, L. Alex Staley, determined that Fluor was responsible for 201 days of compensable delay, causing $368,260 in damages to BAE.[43]  This amount consists of $216,398 of daily delays plus $151,863 in "extended commissioning costs" that BAE was required to pay because of the failure to meet the Project deadline of January 31, 2017.  Staley determined that the remaining 61 days of delay were concurrent and not compensable to either party.  (Def.'s Ex. 732 at 3, 21, 23–24; *see also* BAE Br. 90–93 (summarizing and explaining Staley's testimony concerning delay and damages from delay).)

In their post-trial briefs (as they did in motions to exclude prior to trial), each party points out what it says are flaws with the opposing expert's reasoning and conclusions.  Having considered the arguments of the parties and reviewed the two experts' testimony, the court concludes that Wodiska selected the proper baseline schedule and that Staley did not.  The court also finds that Wodiska conducted a more thorough and complete analysis of project delays than did Staley.

The two experts elected to use different approaches to analyze and attribute the delays in the project, and both methods are accepted in the industry; Wodiska used Method Implementation Protocol ("MIP") 3.7, while Staley used MIP 3.2.  Wodiska explained the flaws with Staley's approach, both in his rebuttal report and in his testimony.  (Pl.'s Ex. 973 (August 1, 2022 Report titled "AMS Schedule Report Rebuttal"); *see generally* Tr. 4 at 269–334.)  The court found those critiques convincing and believes they identified flaws in Staley's approach.

---

[43] The "daily rate" used by Staley differed depending on the project "window" during which the delay occurred.

The court also believes that Wodiska's approach more accurately reflects what actually occurred on the project. In particular, and as an example, Staley's schedule of activities shows that the boilers and a pre-manufactured building to be placed around them are to be erected at the same time. In fact, though, that schedule was issued, but everything was immediately in flux, and no one involved in the project thought it was going to work that way. The sequence of those events, as it actually occurred, resulted in significant delays, and Staley had them incorrectly attributed.[44] Additionally, while Staley attributed delays to Fluor that were allegedly caused by the designer it hired and multiple changes to the designs, Wodiska explained (and documentation supports) that many of the changes (called Architect's Supplemental Instructions, or ASIs) were caused by BAE-directed changes, (Tr. 4 at 276–77), not by changes unilaterally made by Fluor or by flaws in the design. So, those delays should be properly attributed to BAE.

For all of these reasons, the court credits Wodiska's opinion that, of the 262 calendar days of delay (from the January 31, 2017 original substantial completion date until the October 20, 2017 actual substantial completion date), Fluor was responsible for 49 of those days, and BAE was responsible for 213.

For the foregoing reasons, the court finds that nearly all of the delay was excusable, in that BAE and not Fluor caused it. Further, it is clear from the credible testimony of multiple witnesses, as well as contemporaneous documentation, that Fluor was ordered to accelerate work on the Project and that BAE both ordered and was aware of its extensive efforts. Thus, the court will award Fluor damages as to PCNs 20 and 23, in the amounts of $3,796,375 in acceleration

---

[44] Additionally, as Wodiska explained, in April 2016, while negotiating with the Army for the cost of the permanent construction, BAE blamed the Army for compressing the Project schedule, stating that the Army was the cause of *all delay* on the project. (Pl.'s Ex. 298 at 7; *see also* Pl.'s Ex. 234 at 2–3.) Then again, *after* completion of the Project, BAE again blamed the Army for the delays in the project, stating in a certified claim to the Army that "the ultimate reason the package boiler project was not completed prior to the January 31, 2017, compliance date was the Army's inconstancy in selecting a solution to the powerhouse's inability to comply with the boiler MACT." (Pl.'s Ex. 877; Tr. 5 at 269–70 (Wodiska's testimony pointing out this statement).)

costs as sought in PCN 20, and $2,747,218 based on delays attributable to BAE under a schedule variance analysis.

### c. *Damages recoverable on PCN Claim*

Having found that BAE breached the contract by not paying Fluor for all of its PCNs, including PCNs 20 and 23, the court will award Fluor the full amount of damages it seeks on its PCN Claim.  Thus, based on the preponderance of the evidence at trial, the court will award the total amount Fluor seeks to recover for its unpaid PCNs—$9,665,684.  (Tr. 5 at 24–25; *see also* Pl.'s Ex. 975 (summary exhibit listing damages sought by PCN).)

The court turns next to Fluor's request for proposal costs.

### 3. **Fluor's Proposal Costs Claim**

Fluor's third claim seeks recovery of its proposal costs, in the amount of $2,264,627, which it claims are shown and supported in its exhibits.  (Fluor Br. 104–05 (citing Pl.'s Exs. 800, 882; *see also* Pl.'s Ex. 975 (exhibit from Krafft listing that amount for proposal development)).) It also points to the expert testimony of Krafft, in which he expressed that all of the proposal costs were supported and reflected in Fluor's accounting system and were thus unquestionably incurred by Fluor to prepare the change proposals.  (Tr. 5 at 47–48.)

The court concludes that Fluor is entitled to some, but not all, of its proposal costs.  The FAR establishes that Fluor is, as a general matter, entitled to recover its proposal costs, even for proposals that were eventually denied.  *See* FAR § 31.202(a).  Furthermore, BAE's own internal correspondence confirms the same understanding.  (*See* Pl.'s Ex. 976 (BAE representative conceding that "there is no basis for disallowing proposal preparation costs for a subcontractor; proposal preparation costs are allowable in accordance with FAR [§] 31.205-18"); *see also* Pl.'s Ex. 376 (BAE's representation to the Army in 2016 that Fluor's costs are "an allowable cost" per

FAR § 31.205-25(b)(1)(a)).)  And the court already has rejected BAE's contention that Fluor's

proposals were not FAR-compliant; thus, it rejects BAE's argument that Fluor is not entitled to

costs for proposals because they failed to comply with FAR.

 The court also concludes, though, that Fluor is not entitled to recover its attorneys' fees,

which represent approximately one-third of those costs.  On this point, Fluor bears the burden of

showing that the attorneys' fees were objectively incurred for the purpose of furthering

legitimate negotiations, and not for the purpose of preparing for litigation.  *See E. Coast Repair*

*& Fabrication, LLC v. United States*, 199 F. Supp. 3d 1006, 1097 (E.D. Va. 2016) ("[C]osts

incurred as part of the submission and negotiation of a claim are allowable, while costs incurred

for the purpose of prosecuting a claim in litigation are unallowable.").  Fluor has not met this

burden.  In particular, Fluor's proposal costs included about $831,000 in costs billed by its

litigation counsel in this case, Watt Tieder.  Fluor has not produced attorney invoices to prove

the amount and reason for those fees.  Moreover, Fluor included in proposal costs attorneys' fees

incurred while litigation was ongoing or at a time (as early as January 13, 2017) when documents

were created that Fluor has since labeled as work product, *i.e.*, created in anticipation of

litigation.  This includes more than $300,000 for costs allegedly incurred in December 2018 and

February 2019, but Fluor's own witness, Mike Sipple, testified that there were no substantive

negotiations occurring between the parties, nor their outside counsel, at that time.  (*See* Tr. 3 at

219–220.)

 Given these uncertainties, the court will disallow the proposal costs that seek

reimbursement of fees paid to Watt Tieder.  Accordingly, on the Proposal Claim, the court will

award only the amount of proposal fees proven to have been incurred (and supported by Krafft's

expert testimony), but not attorneys' fees billed by Fluor's litigation counsel, Watt Tieder, which are unsupported by any invoices, redacted or otherwise.[45]

Neither party has presented to the court an exact figure as to the total amount of Watt Tieder fees; BAE claims it was around $831,000.[46]  (BAE Br. 97.)  In light of Fluor's failure to prove that those fees were not litigation expenses and were accurately attributable to proposal costs, the court will subtract the challenged amount from the total amount of proposal costs sought by Fluor.  The court recognizes that this is not an exact figure, but it will not do the work for the parties in identifying an exact amount of Watt Tieder fees.  Accordingly, the court will subtract $831,000 from the total amount of proposal costs Fluor seeks ($2,264,627) and will award Fluor $1,433,627 in proposal costs.

To the extent Fluor seeks a separate award of costs as a prevailing party, those costs are rejected.  Under Virginia law, each side must bear its own fees, and Fluor cites to no provision in the Subcontract or any applicable statute that would allow it to recover its fees from BAE.[47]

### 4.  Fluor's Claim for Breach of Good Faith and Fair Dealing (GFFD)

In its final claim, Fluor contends that BAE breached its duty of good faith and fair dealing (GFFD).  Every contract governed by Virginia law contains an implied covenant of good faith and fair dealing.  *See Va. Vermiculite, Ltd. v. W.R. Grace & Co.*, 156 F.3d 535, 541–42 (4th Cir. 1998).  A party breaches its GFFD duty in one of two ways.  First, "where a party has a clear

---

[45]  BAE argues that the timing of the fees and the failure to produce its legal invoices "taints Fluor's entire claim for proposal costs."  (BAE Br. 98.)  Put differently, "by failing to separate out costs which might be recoverable from those that are not, Fluor has failed to prove entitlement to any of its claimed costs."  (*See id.* at 99.)  The court disagrees.  Krafft's testimony sufficiently supports the remaining amounts sought.

[46]  BAE cites to exact amounts only for certain timeframes, and the court has reviewed the cited exhibits, which corroborate the figures in BAE's brief.  But neither BAE nor Fluor has pointed the court to the full amount of Watt Tieder fees.

[47]  BAE insists that the Subcontract contains no provision that would allow Fluor to recover its attorneys' fees.  (BAE Br. 99.)  Fluor does not appear to contest this.

contract right [to act a certain way], even if its exercise would arguably be arbitrary, that party is only forbidden from acting dishonestly." *Stoney Glen, LLC v. S. Bank & Trust Co.*, 944 F. Supp. 2d 460, 466 (E.D. Va. 2013) (citation omitted).  Second, "where a party has discretion in performance, that party cannot act arbitrarily or unfairly." *Id.*

Fluor claims that BAE breached its GFFD duty in three basic respects.  First, it violated its GFFD duty by refusing to reasonably negotiate changes after finding Fluor's costs fair and reasonable and representing the same to the Army.  Second and relatedly, it breached by rejecting Fluor's change proposals.  Third, BAE breached the duty of GFFD by concealing material information and then using that concealment to gain an advantage.  The court addresses these briefly (discussing the first and second together).  Overall, the court is not convinced that Fluor met its burden to show a breach of BAE's duty of GFFD.

### a.   Alleged Failure to Negotiate/Rejection of Proposals

First, Fluor argues that BAE did not negotiate the UCO in good faith or Fluor's proposal to definitize the construction price.  The court agrees that there is some evidence that BAE was acting unfairly or arbitrarily in rejecting Fluor's proposals.  In particular, the court finds it arguably arbitrary that BAE repeatedly told the government that Fluor's costs were (mostly or entirely) fair and reasonable, but then refused to pay Fluor (at least for a time) after the government rejected BAE's proposals.  Ultimately, though, BAE did pay Fluor's invoices throughout the project, and, in fact, paid millions of dollars more than Fluor sought in its June 2016 proposal.

The failure of the parties to definitize the UCO was certainly unfortunate, but the court finds that *both* parties share the blame as to why they were unable to reach an agreement.  Both dug their heels in to some extent, as neither wanted to have to take the financial hit for the

increased costs of this project.  The court cannot, however, find that Fluor has proven bad faith on the part of BAE.  BAE was entitled to seek to enforce the terms of mod 7, and to insist upon what it believed was needed to comply with the FAR requirements, even though the court has now found that Fluor's proposals were FAR-compliant.  Indeed, the fact that experts in the field disagreed so much about what occurred during this project suggests to the court that both parties had at least a good-faith basis for their respective positions during negotiating.  Thus, the court does not find a breach of the duty of GFFD by BAE's alleged failure to negotiate.

### b.  *Concealment of material information*

Fluor also argues that BAE breached its GFFD duty by concealing material information from it, and BAE does not contend that it shared all of the pertinent information it had with Fluor, particularly prior to entering into the contract.  The court, too, finds that BAE certainly withheld information *prior* to entering into the original Subcontract.  Specifically, BAE failed to disclose the near certainty of a permanent facility and failed to disclose its own time estimates of the project while simultaneously insisting to Fluor that the deadline completion date could be met.  But, by the time that Fluor entered into subsequent modifications and agreed to the revised Scope of Work in Addendum rev. 4, it knew and had agreed to the scope of the project.  Thus, even if BAE breached its GFFD duty in this respect, the court does not find that it caused any damages to Fluor.  Thus, the court does not find in Fluor's favor on this claim.

### E.  BAE's Breach-of-Contract Claims

The court turns next to BAE's claims.  As noted *supra*, BAE seeks to recoup $6 million it paid to Fluor in conjunction with Mod 7.  Second, BAE asserts a claim for the delays and allegedly defective work.

**1. BAE did not first materially breach the contract.**

In defending against BAE's claims, Fluor argues that BAE may not sue on the contract because it was the first party to materially breach it.  As the court explained in discussing this concept in connection with Fluor's claims, "[a] material breach of contract occurs if a party fails to do something that he is bound to do according to the contract and that is so important and central to the contract that the failure defeats the very purpose of the contract." *Elite Ent., Inc. v. Khela Bros. Ent. Inc.*, 396 F. Supp. 2d 680, 693 (E.D. Va. 2005) (citing *Horton,* 487 S.E.2d at 204).  In *Elite Entertainment*, the court found that a failure to pay as obligated under the contract constituted a first material breach.  *Id.* at 693; *see also Design & Prod., Inc. v. Am. Exhibitions, Inc.*, 820 F. Supp. 2d 727, 736 (E.D. Va. 2011) (concluding defendant breached a firm fixed price contract when it failed to pay outstanding balance due after accepting benefits of contract).  "Once a party to a contract materially breaches the contract, the other party is relieved of all continuing obligations under the contract, and the first breaching party may not sue to enforce subsequent breaches by the other party."  *Design & Prod., Inc.*, 820 F. Supp. 2d at 738 (citing *Horton*, 487 S.E.2d at 204).

Although the court has found BAE breached the contract by failing to pay Fluor for the additional Base Scope work up to the NTE, whether that breach was "material" is more difficult to determine.  Typically, "under Virginia law, a contractual party's failure to make timely payment constitutes a material breach."  *Tandberg, Inc. v. Advanced Media Design, Inc.*, No. 1:09CV863, 2009 WL 8705814, at *4 (E.D. Va. Dec. 11, 2009) (citing *Johnson v. D & D Home Loans Corp.,* No. 2:07cv204, 2008 WL 851083, at *7 (E.D. Va. Jan. 23, 2008); *Countryside Orthopaedics, P.C. v. Peyton,* 541 S.E.2d 279, 286 (Va. 2001) (same).  Here, though, the parties were still in the process of negotiating the full amount of payment that would be made on the

contract, so it is not clear exactly *when* payment was "due."  Nonetheless, the court will assume without deciding that BAE's breach was material.

The lack of a firm date by which BAE was obligated to pay also complicates the determination of when any breach occurred; instead, the parties continued to negotiate the costs. Fluor submitted its proposal for additional Base Scope costs and for the PCNs in August 2017. BAE rejected that proposal on October 26, 2017, when BAE's Hotta wrote and asked Fluor to provide different information, allegedly to "correct" the proposal.

At the earliest, then, BAE's breach occurred on October 26, 2017. On October 20, 2017, however, the Project had already reached substantial completion.  So, even assuming BAE's failure to pay was material, BAE's claims for delays and defective work were based on *prior* alleged breaches by Fluor, not subsequent breaches.  BAE is not precluded from asserting them in its counterclaim.  Thus, the court addresses BAE's two claims.

### 2. Mod 7 Claim: $6 million

According to BAE, Subcontract Mod 7 is the single most important document in the entire case, and it contained what BAE describes as "bilateral promises," although the text of that modification nowhere states that the promises are conditioned on the other party's performance. In Mod 7, the parties agreed to increase the NTE for SOW Addendum Rev. 4 work by $8 million and BAE agreed to immediately pay Fluor $6 million of that amount.  Mod 7 also required Fluor (1) to provide a change proposal in accordance with FAR § 15.408, Table 15.2 Section III; and (2) to provide contract and financial personnel and resources to assist BAE OSI in recovering the $6 million BAE from the Army.

This claim turns primarily on whether Fluor filed a change proposal in accordance with FAR § 15.408, Table 15.2 Section III.  As noted, the court has concluded that it did.  Thus, there

has been no breach of that promise by Fluor.

Likewise, BAE also states that Fluor failed to provide financial and contract resources to assist BAE in recovering the $6 million from the Army that BAE paid to Fluor, as required by Mod 7.  As discussed above, in determining whether Fluor materially breached the contract, the court already has concluded that there was no breach as a result of any "failure" to provide such resources.  Thus, BAE is not entitled to claw back $6 million on the grounds that Fluor's breaches caused that damage.[48]

### 3.  Delay/Defective Work Claim: $740,610

In its second claim, BAE seeks damages for Fluor's breach of contract in terms of providing non-compliant and/or deficient work on the Project.  It describes Fluor's work as "riddled with errors and missteps attributable to Fluor and its subcontractors."  (BAE Br. 91.) According to BAE,  the direct costs attributable to Fluor errors and mismanagement included about $109,000 in additional meetings and approximately $192,000 in direct costs associated with repairing or finishing the work, for a total amount of $301,792.  BAE also seeks damages of approximately $440,000 in delay damages.

In opposing this claim, Fluor first argues that BAE waived the contractual completion date.  The court rejects that argument for several reasons.  While the contract itself had an anti-waiver provision, it is not dispositive.  (*See* J. Ex. 1, Subcontract §§ 1A(6); 1A(7)(d); 1B(20).) Fluor argues that BAE waived its right to any delay damages both because it allowed a

---

[48]  Because the court already has found that there was no breach by Fluor of Mod 7, BAE's claim fails.  The court further disagrees with BAE, though, that the payment of $6 million to Fluor is properly characterized as an "overpayment."  Instead, the court finds that the $6 million payment was for work already performed and installed on the project in December 2016 (*see* J. Ex. 2 (Fluor invoice from March 3, 2017)), and testimony indicated that all payments made to Fluor on the project (including this one) were made after BAE had inspected and confirmed the work.  (*See* Tr. 7 at 191–192.)

modification after the contractual completion date and because it continued to allow Fluor to work on the project after that date.  Fluor's position, however, is contrary to Virginia law.

In Virginia, a party waives a contract right only when the waiver is knowing and intentional.  *See May v. Martin*, 137 S.E.2d 860, 865 (Va. 1964) ("Waiver is the intentional relinquishment of a known right, with both knowledge of its existence and an intention to relinquish it.") (citation omitted).  Furthermore, Virginia law requires that the party claiming waiver has the burden of establishing it "by clear and unmistakable proof."  *Id.*; *see also Serv. Steel Erectors Co. v. SCE, Inc.*, 573 F. Supp. 177, 179 (W.D. Va. 1983) (citing *May* for that proposition and declining to find waiver on facts before it); *Heinrich Schepers GmbH & Co, KG v. Whitaker*, 702 S.E.2d 573, 577 (Va. 2010) (explaining that a person will be found to have waived a right only if "plainly appear[s]" that "he knows his rights, and intends to waive them").  Here, although the parties entered into a contract modification after the contractual completion date, that modification did not set a new deadline for completion, instead leaving the now-passed deadline unchanged.  Further, BAE took no other action to affirmatively waive the completion deadline or its right to seek delay damages.

Importantly, moreover, the fact that BAE let Fluor continue to work on the project after the contractual completion deadline does not, standing alone, constitute an affirmative waiver of that deadline.  As the *May* court explained, "allowing a party to complete his contract is no waiver of a right or claim to damages or loss incurred and actually paid caused by his failure to complete it at the time agreed on."  137 S.E.2d at 865; *see also id.* at 864 ("Acquiescence, that is, the failure to protest or object, is an element of waiver; but does not of itself constitute waiver.").  *Stanley's Cafeteria, Inc.*, 306 S.E. 2d at 873 ("[S]tanding alone, an obligee's acceptance of less

than full performance by the obligor does not prove intent to relinquish the right to enforce full performance.")

Fluor argues that *May v. Martin* is factually distinguishable because the owner in that case repeatedly advised the contractor of an intent to hold the contractor responsible for delay damages.[49] (Fluor Br. 103.)  There was testimony at the trial in that case from the owner to that effect.  *See May*, 137 S.E.2d at 863.  By contrast, BAE did not affirmatively indicate that it intended to hold Fluor responsible for delays.  Nonetheless, in light of all the facts, the court concludes Fluor has not proven by "clear and unmistakable proof" or otherwise that BAE intentionally waived its right to insist on timely contract completion.  *Cf. id.* at 865.  Fluor could have negotiated for additional time to complete the project or for a new (or revised) completion date, but it failed to do so.  It cannot now complain that it is being held to the date to which it agreed.

Nonetheless, to recover on its contract claim, BAE acknowledges that it must prove that Fluor's late completion of its work was unexcused, that Fluor provided deficient and non-conforming work, and that BAE incurred that amount of damages for those breaches.  Fluor also counters that any delay was BAE's fault and that its work was not defective in any event.  Fluor also notes that these claims were never presented to Fluor at any time prior to May 2022, which was the first time BAE claimed these damages (more than two years after this lawsuit was filed),

---

[49]  Fluor also urges the court to be guided by federal authority and notes the Fourth Circuit has held that looking to federal precedent is appropriate where "there are no comparable precedents in Virginia decisions."  (Fluor Br. 101–02 quoting *Brinderson Corp. v. Hampton Roads Sanitation Dist.*, 825 F.2d 41, 44–45 (4th Cir. 1987)).)  It then cites to several decisions from the Court of Federal Claims and the Eleventh Circuit finding waiver where a general contractor allowed a sub-contractor to continue performance past the original deadline without re-establishing a new completion date, including in at least one circumstance where a written modification occurred, but the parties agreed "to make final adjustment of price and time."  (*Id.* at 95 (citing *Martin Const., Inc. v. United States*, 102 Fed. Cl. 562, 592 (Fed. Ct. Claims 2011); *SIPCO Servs. & Marine Inc. v. United States*, 41 Fed. Cl. 196, (1988); *RDP Royal Palm Motel v. Clark Const. Group, Inc.*, 168 F. App'x 348 (11th Cir. 2006)).)  The court declines to consider this authority as there is Virginia law on the topic, as discussed in the text.

and that the damages are speculative and unsubstantiated.  The court need not address all of these defenses because it concludes that the last one is persuasive.

In particular, the court agrees with Fluor that BAE has failed to prove damages associated with delays or allegedly defective work by a preponderance of the evidence.  The damages were calculated and set forth by a single witness, BAE's John Dennis, who did not provide background information or documentation to support those damages, just a spreadsheet he had created.  Moreover, BAE's expert Staley, who included those direct costs in his 2022 expert report, offered no opinion on reasonableness, allocability, or estimating those costs.  By contrast, Fluor's expert, Krafft, credibly testified that he had analyzed BAE's alleged damages and that they generally lacked substantiation.  (Pl.'s Ex. 974 at 5–13.)  In short, the court finds that BAE has not proven that it actually incurred these damages, even if compensable, or that they were attributable to Fluor.  Thus, the court will not award damages on BAE's claim for damages for delay and defective work.

*     *     *

For the foregoing reasons, the court will not award BAE any damages as to its breach-of-contract claims.

## F.  Damages Calculations and Prejudgment Interest[50]

As noted above, the court is not awarding any damages to BAE.  With regard to Fluor, and as noted when discussing the court's factual findings, Fluor's damages calculations have changed slightly over time.  The court uses the amounts as set forth by Mr. Krafft and in Pl.'s Exhibit 975.  Based on those amounts, the court awards the following amounts: $2,000,000 on

---

[50] In its post-trial brief, BAE argues that Fluor is not entitled to attorneys' fees in this action, even if it were to prevail.  Fluor, however, did not mention that request for relief in its post-trial brief and does not appear to be seeking attorneys' fees.  Thus, the court does not address that issue.

the Base Scope Claim, $9,665,684 on Fluor's PCN Claim, and $1,433,627 on Fluor's Proposal

Costs Claim, for a total of $13,099,311.   The court will enter judgment in Fluor's favor as to its

breach of contract claims in that total amount.

Fluor also has requested prejudgment interest, although it acknowledges that the award of

interest is discretionary, as is the setting of the accrual date.  *See Upper Occoquan Sewage Auth.*

*v. Blake Constr. Co.*, 655 S.E.2d 10, 23 (Va. 2008).  The court concludes that prejudgment

interest starting from sixty days after Fluor's August 2019 proposal is warranted.  In that

proposal, Fluor informed BAE that it would pursue litigation if it was not paid or if the issues

were not resolved within 60 days.  The court will award prejudgment interest from October 11,

2019 (60 days after the August 12, 2019 proposal) through the date of entry of judgment.  The

rate of prejudgment interest shall be as set forth in Virginia Code Ann. § 6.2-302.

## V.  CONCLUSION

For the foregoing reasons, the court will enter judgment consistent with its findings and

conclusions herein, and award $13,099,311 to Fluor on its breach-of-contract claims and $0 to

BAE on its counterclaim breach-of-contract claims.  The court further awards prejudgment

interest to Fluor on the full amount of the judgment from October 11, 2019, at the rate set forth

in Virginia Code Ann. § 6.2-302.

An appropriate order and judgment will be entered.

Entered: October 30, 2024.

*/s/ Elizabeth K. Dillon*

Elizabeth K. Dillon
Chief United States District Judge